**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

|  |  |  |
|---|---|---|
| JULIAN RAY BETTON, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | |
| | ) | |
| BILL KNOWLES in his individual capacity and official capacity as Commander of the 15th Circuit Drug Enforcement Unit Task Force; JIMMY RICHARDSON II in his individual capacity and official capacity as 15th Circuit Solicitor; DEAN BISHOP in his individual capacity; CHAD GUESS in his individual capacity; FRANK WADDELL in his individual capacity; CHRIS DENNIS in his individual capacity; DAVID BELUE in his individual capacity, and THE CITY OF MYRTLE BEACH. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **FIRST AMENDED COMPLAINT** **(Jury Trial Demanded)** |
| *Defendants*. | ) ) | |

Plaintiff Julian Ray Betton alleges as follows:

## INTRODUCTION

1.      In early 2015, Defendant Chad Guess, a member of the 15th Circuit Drug Enforcement Task Force in Myrtle Beach, South Carolina, twice gave a confidential informant $100 to purchase marijuana from Plaintiff Julian Ray Betton.  On each occasion, the confidential informant reported that she used the money to purchase a small quantity of marijuana from Betton.

2.      Based on the confidential informant's report, Defendant Guess obtained an arrest warrant for Betton and a search warrant for his apartment.

3.      The arrest warrant that Defendant Guess procured against Betton was for a Class F felony that is typically resolved in the 15th District by a fine or, at most, probation.

4.      Since moving to South Carolina in 2008, Betton had never been charged with any crime.

5.      Betton walked almost every day to a Scotchman store a quarter mile from his home.   Armed with the arrest and search warrants, two law enforcement officers could have peacefully and safely arrested Betton on his way to or from the store, and then searched his apartment.

6.      Instead, on the afternoon of April 16, 2015, Defendants assembled a team of at least twelve heavily armed agents to execute the warrants.  The agents wore street clothes and bulletproof vests.  They wore no visible insignia identifying them as law enforcement officers. They stormed Betton's home, ramming down his unlocked front door and entering without knocking or announcing themselves as law enforcement officers, in violation of the Fourth Amendment.

7.      Betton was emerging from the bathroom when Defendants broke down his door and entered his apartment.  When Betton stepped out of the bathroom, he saw three unidentified men carrying assault rifles in his living room.  He did not know who the intruders were. Defendants opened fire on Betton only seconds after they entered the apartment.  They shot 29 bullets at Betton, nine of which hit him.

8.      Betton's extensive injuries left him in a coma for six weeks.  Doctors removed portions of his gallbladder, colon, bowel, and rectum.  They inserted a metal rod in his left leg. His spine was severely damaged, leaving him permanently paralyzed from the waist down.

9.      After shooting and paralyzing Betton, Defendants tried to cover up their misconduct.  They falsely claimed that they only entered Betton's apartment after knocking, announcing, and waiting for a response, and that Betton shot at them first.  Defendants' lies were uncovered in an investigation by the State Law Enforcement Division and through recordings from Betton's surveillance system.

10.     As a direct and proximate result of Defendants' misconduct, Betton sustained injuries and damages including, among others, the following: personal injuries, physical injuries, paralysis, medical expenses, life-care expenses, permanent disability, loss of income, physical pain and mental suffering, severe emotional distress, humiliation, indignities and embarrassment, and loss of reputation.

11.     Defendants' conduct violated Betton's rights under South Carolina law and the Fourth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

12.     Betton brings this civil action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law that deprived Betton of his rights under the Fourth and Fourteenth Amendment of the United States Constitution.  This case also arises under the common law of the State of South Carolina.

13.     Betton's action arises under the Constitution and laws of the United States.  This Court has original jurisdiction over Betton's federal claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

14.     This case also arises under the common law of South Carolina.  This Court has pendent jurisdiction over Betton's state law claims under 28 U.S.C. § 1367.

15.    All material events giving rise to this cause of action occurred in Horry County, South Carolina.  Upon information and belief, each Defendant resides in Horry County, South Carolina.

16.    Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the District of South Carolina.

## PARTIES

17.    Plaintiff Julian Ray Betton is a citizen and resident of Horry County, South Carolina.  Betton is thirty-two years old.  Betton is African-American.

18.    Defendant Bill Knowles is the Commander of the 15th Circuit Drug Enforcement Task Force ("DEU").  Upon information and belief, Defendant Knowles is a citizen and resident of Horry County, South Carolina.  Defendant Knowles is sued in his individual capacity and in his official capacity. Knowles is white.

19.    Defendant Jimmy Richardson, II is the 15th Circuit Solicitor.  Upon information and belief, Defendant Richardson is a citizen and resident of Horry County, South Carolina.  Defendant Richardson is sued in his individual capacity and in his official capacity. Richardson is white.

20.    Defendant Dean Bishop is Deputy Commander of the DEU.  Upon information and belief, Defendant Bishop is a citizen and resident of Horry County, South Carolina.  Defendant Bishop is sued in his individual capacity. Bishop is white.

21.    Defendant Chad Guess is an officer with the Coastal Carolina University Department of Public Safety and is assigned to the DEU.  Upon information and belief, Defendant Guess is a citizen and resident of Horry County, South Carolina.  Defendant Guess is sued in his individual capacity. Guess is white.

22.     Defendant Frank Waddell is an officer with the Coastal Carolina University Department of Public Safety and is assigned to the DEU.  Upon information and belief, Defendant Waddell is a citizen and resident of Horry County, South Carolina.  Defendant Waddell is sued in his individual capacity. Waddell is white.

23.     Defendant Chris Dennis was, on April 16, 2015, an officer with the Horry County Sheriff's office assigned to the DEU.  Upon information and belief, Defendant Dennis is a citizen and resident of Horry County, South Carolina.  Defendant Dennis is sued in his individual capacity. Dennis is white.

24.     Defendant David BeLue is an officer with the Myrtle Beach Police Department and is assigned to the DEU.  Upon information and belief, Defendant BeLue is a citizen and resident of Horry County, South Carolina.  Defendant BeLue is sued in his individual capacity. BeLue is white.

25.     Defendant City of Myrtle Beach is a municipal entity organized under the laws of the State of South Carolina.

## **FACTS**

**A.     Local Law Enforcement Agencies Form the 15th Circuit Drug Enforcement Unit.**

26.     South Carolina's 15th Judicial Circuit is comprised of Horry and Georgetown Counties.

27.     In or about 2005, various law enforcement agencies within the 15th Judicial Circuit formed the 15th Circuit Drug Enforcement Unit (the "DEU"), a regional drug task force operating across the judicial district pursuant to South Carolina Code § 23-1-210, *et seq.* The DEU became operational in or about January 2006.

28.      Agencies participating in the DEU contribute their own law enforcement agents to the DEU to serve as "DEU agents."

29.      Agencies participating in the DEU also provide the DEU the legal authority to exercise police powers within their jurisdiction. DEU agents therefore have the legal authority to exercise police powers within the jurisdiction of each agency participating in the DEU.

30.      Agencies currently participating in the DEU include the Aynor Police Department, the Surfside Beach Department of Public Safety, the Georgetown City Police Department, the Conway Police Department, the Coastal Carolina University Police, the North Myrtle Beach Department of Public Safety, the Myrtle Beach Police Department, the Georgetown County Sheriff's Office, the Horry County Sheriff's Office, the Horry Police Department, and the Fifteen Circuit Solicitor's Office (together, the "Contributing Agencies").

31.      The DEU is overseen by Defendant Richardson and a Governing Board comprised of representatives from each of the Contributing Agencies.

32.      To participate in the DEU, the governing body of a law enforcement agency must ratify a DEU Agreement.

33.      By executing the DEU Agreement, each governing body, *inter alia*:

a.      Committed to appoint agents to the DEU with the advice and consent of the DEU Commander;

b.      Agreed that all agents appointed to the DEU would adhere to DEU policies and procedures;

c.      Granted the DEU Governing Board authority to set policy, approve the budget, and provide general direction for DEU operations;

      d.      Agreed that each DEU agent would report to the DEU Commander and the Governing Board, regardless of their home agency;

      e.      Agreed that the DEU Commander or Deputy Commanders would be responsible for direct supervision of the DEU and DEU agents, regardless of their home agency;

      f.      Agreed that all DEU investigations, targets, areas of interest, and activities would be reported solely through the DEU Commander and the Governing Board; and

      g.      Agreed to avoid unnecessary involvement in DEU investigations.

34.      The DEU Governing Board meets monthly.  Its duties include establishing and reviewing DEU's policies, conducting administrative and operational oversight of DEU activities, approving expenditures, supervising the DEU Commander, and reviewing incidents involving the use of force by DEU agents.

35.      The majority of the DEU's agents are law enforcement officers employed by the Contributing Agencies and assigned to the DEU.  The DEU directly employs its high-ranking officers, including Defendant Knowles and Defendant Bishop.

36.      An agent assigned to the DEU continues to be an employee of the agent's home agency.  The home agency pays the agent's salary.  The home agency provides the agent's equipment.  The home agency retains authority to terminate or promote the agent.  The home agency assumes all civil liability for actions against the agent acting within the scope of his duties.

37.      Agents assigned to the DEU operate within the DEU's command structure.  They are trained, supervised, and directed by DEU officers, including by Defendants Knowles and Bishop.  They perform their job duties according to the DEU's policies and practices.

38.    As of April 2015, the DEU was primarily funded by the governing bodies of the Contributing Agencies and civil forfeitures.  The DEU has its own bank accounts and contracts with other entities in its own name.

**B.    The City of Myrtle Beach's Participation in the DEU.**

39.    The City of Myrtle Beach has participated in the DEU since its inception.  By participating in the DEU, the City of Myrtle Beach gave its authority to exercise police powers within the corporate limits of Myrtle Beach to the DEU.  The DEU would not have exercised police powers within Myrtle Beach if the City of Myrtle Beach did not participate in the DEU.

40.    Before the DEU began operations in early 2006, the Myrtle Beach Police Department ("MBPD") maintained a separate narcotics division to investigate drug crimes and enforce drug laws in the City of Myrtle Beach.  In or around 2006, MBPD dissolved its narcotics division, assigned all of the officers in that division to the DEU, and delegated its narcotics investigation and enforcement activities to the DEU.  Since then, MBPD has not maintained a separate narcotics division, and the City has relied on the DEU to conduct nearly all of its drug enforcement investigations and activities.

41.    On September 23, 2014, the Myrtle Beach City Council voted to ratify a revised DEU Agreement containing the provisions in paragraph 33 above.  That DEU Agreement was in effect throughout April 2015.

42.    The City of Myrtle Beach and MBPD maintained a policy and practice of deferring to the DEU and Defendant Knowles in all matters related to the DEU's police work and in all matters related to the supervision of DEU personnel, including Myrtle Beach Police Officers assigned to the DEU.

C.     **The DEU Maintains a Pattern and Practice of Disregarding the Fourth Amendment.**

43.     The DEU typically executes multiple search warrants every month.  In doing so, DEU agents routinely violate the Fourth Amendment.

44.     When executing residential search warrants, the DEU almost always uses SWAT-like, militarized tactics and forcible, dynamic entry.  The DEU and DEU agents do not consider the individual circumstances surrounding the subjects of the search warrant when deciding to use force.  The DEU often uses SWAT-like tactics and forcible, dynamic entry when there are no facts indicating that such an approach is reasonable or necessary.

45.     The DEU regularly executes residential search warrants with little advance planning and with little investigation into the factual circumstances surrounding the warrant.

46.     The Fourth Amendment generally requires law enforcement officers executing a search warrant to "knock and announce" before entering a home and to wait a reasonable time for a response before forcing entry.

47.     The "knock and announce" requirement ensures that occupants are notified that law enforcement officers are executing a search warrant.  By knocking and announcing, officers ensure that occupants know that any individual entering their home is a law enforcement officer, reducing the risk of violence and property damage.  Knocking and announcing also gives occupants the opportunity to permit law enforcement officers to enter peacefully, further reducing the risk of violence and property damage.

48.     DEU agents generally do not knock or announce before forcing entry, even when no facts would justify such an entry.

49.     When DEU agents do knock and/or announce, they almost never wait before forcing entry.  They instead knock and/or announce simultaneously with the forced entry.

50.     The DEU does not provide standardized uniforms for its agents nor require that its agents wear uniforms of any law enforcement agency.  DEU agents routinely execute search warrants without wearing clothing that plainly identifies them as law enforcement officers.

51.     As DEU Commander, Defendant Knowles was responsible for the day-to-day operations of DEU agents.  Defendant Knowles' duties included training, supervising, and disciplining agents assigned to the DEU, as well as establishing and promulgating policies and practices for field operations.

52.     Defendant Knowles established and promulgated the DEU's policies and practices regarding the execution of search warrants.  When Defendant Knowles drafted, and the Governing Board approved, the initial Standard Operating Procedures ("SOPs") for DEU agents in or about late 2005, the SOPs failed to include any policy or guidance for obtaining and executing residential search warrants.  Those SOPs, without that guidance, remained in effect on April 16, 2015.  Defendant Knowles encouraged, condoned, and approved of DEU agents' failure to abide by the Fourth Amendment's knock and announce requirements.

53.     Defendant Knowles often accompanied DEU agents when they executed search warrants.  He observed DEU agents violating the Fourth Amendment in conformity with DEU policies and practices, including defendants BeLue, Dennis, Guess, and Waddell.  The agents' actions were consistent with how the DEU trained agents to execute search warrants.  Knowles did not seek to correct DEU agents' misconduct, and instead encouraged, condoned, and approved of that misconduct.

54.     Defendant Richardson had responsibility to oversee DEU's operational policies and procedures, including the use of knock and no-knock search warrants. Defendant Richardson

condoned and approved of DEU agents' failure to abide by the Fourth Amendment's knock and announce requirements.

55.      As Deputy DEU Commander, Defendant Bishop helped enforce and implement policies and practices for field operations.  Defendant Bishop helped establish DEU agents' pattern and practice of failing to abide by the Fourth Amendment's knock and announce requirements.

56.      Defendant Bishop often participated in the execution of search warrants. Defendant Bishop frequently failed to abide by the Fourth Amendment's knock and announce requirements when executing search warrants.  He frequently observed DEU agents violating the Fourth Amendment's knock and announce requirements when executing search warrants.

57.      When the DEU executed a search warrant within the City of Myrtle Beach, MBPD officers who were not assigned to the DEU provided support to the DEU.  As a result, those MBPD officers were routinely exposed to the policies, patterns, and practices of the DEU.

**D.      Betton Lives Peacefully at 602 Withers Swash Drive.**

58.      Betton was born in Ohio in 1984.  Betton has a degree in culinary arts.

59.      In 2008, Betton moved to Myrtle Beach, South Carolina.  He earned a living by filming and editing music videos for musicians, bands, and choirs, and by working as a contract painter for Perfection Plus Painting, painting the interior and exterior of buildings in and around Horry County.

60.      In January 2013, Betton moved into Apartment # 2 at 602 Withers Swash Drive in Myrtle Beach.

61.      Betton got along well with his neighbors, who described him as respectful and considerate.

62.     Betton had never been charged with any crime since moving to South Carolina in 2008.

63.     In early 2014, Betton was the victim of a home robbery.  Under the guise of hiring Betton for a recording session, a group of men entered his apartment, attacked him, and robbed him.  The night of the assault Betton went to the hospital, where he was treated for wounds to his head and arm.

64.     Following this incident, Betton obtained several guns to keep in his home for protection.  He never fired the weapons, which he possessed lawfully.

**E.     Defendant Guess Obtains a Search Warrant for Mr. Betton's Apartment.**

65.     On two occasions in early 2015, Defendant Guess gave a confidential informant $100 to purchase seven to eight grams of marijuana from Betton.  The confidential informant reported to Guess that Betton sold her the marijuana, and that both sales took place in his apartment.

66.     Based on this information, Defendant Guess sought and obtained an arrest warrant for Betton and a search warrant for Betton's apartment.

67.     In obtaining the residential search warrant, Defendant Guess falsely swore to the magistrate that Betton distributed "other various drugs," in addition to marijuana, at the apartment. Guess had no factual basis for making the false statement.

68.     Magistrates in Myrtle Beach can and do issue "no-knock warrants," which authorize law enforcement officers to enter a home without first knocking and announcing.  To obtain a no-knock warrant, a law enforcement officer must inform the magistrate of specific, particularized facts indicating that knocking and announcing their presence would be dangerous or futile, or that it would inhibit the effective investigation of a crime.

69.    Defendant Guess knew how to procure "no-knock" warrants.

70.    Defendant Guess did not seek or secure a "no-knock" warrant for Betton's home.

71.    Defendant Guess did not seek a no-knock warrant because he knew of no facts that would support the issuance of such a warrant.

**F.    Approximately Twelve Officers Converge to Execute the Warrants**.

72.    Defendant Guess was the agent in charge of the execution of the Betton warrants. Defendant Guess developed the plan for how to execute the warrants.  He determined how many officers to request, where and what duties to assign them, how to achieve entry to Betton's home, and how Betton's arrest would be secured.

73.    Before developing the plan, Defendant Guess failed to conduct a reasonable, meaningful investigation of Julian Betton, including his criminal record.  Such an investigation would have confirmed that Betton had no history of violence.

74.    Defendants Knowles and Bishop reviewed and approved Defendant Guess's plan. Defendants Knowles and Bishop knew or should have known that Defendant Guess had conducted almost no investigation of Julian Betton and the factual circumstances surrounding his alleged criminal misconduct.

75.    When developing his plan, Defendant Guess knew that Betton did not have a car and went almost everywhere on foot. He also knew or should have known that, nearly every day, Betton walked to and from a nearby Scotchman convenience store through an open, unobstructed lot, a quarter mile from his apartment.  Defendant Guess knew or should have known that it would have been safe and straightforward for two or three DEU officers to execute the arrest warrant on Betton during his daily walk, and then execute the search warrant on Betton's apartment.

76.     Defendant Guess instead elected to execute the search and arrest warrants through the SWAT-like use of a dozen armed officers, at least four of whom were heavily armed with semi-automatic rifles, and forcible, dynamic entry into Betton's apartment.  Guess knew or should have known that his raid plan required far more police resources and created a dramatically higher risk of serious injury for Betton, law enforcement officers, and bystanders.

77.     Defendants Knowles and Bishop could have required that their subordinates execute the warrants by safely arresting Betton on his daily walk to and from the Scotchman.

78.     On Defendant Guess's request, and with Defendants Knowles' and Bishop's approval, ten DEU agents were assigned to execute the Betton warrants.  The agents included Defendants BeLue, Dennis, Guess, Waddell, and Bishop.  Two additional MBPD officers were assigned to assist in the execution of the search warrant.

79.     Defendant Guess failed to assign individual officers specific roles when executing the search warrant.  Defendant Guess instead decided that each officer would figure out his or her specific role upon arrival at the scene.

80.     Defendant Bishop was the highest ranking DEU agent assigned to execute the Betton warrants.  Defendant Bishop could have required that his subordinate agents knock on Betton's door and announce themselves as law enforcement officers before forcing entry into Betton's home.

81.     Defendant Bishop knew that if he did not specifically instruct the DEU agents to abide by the Fourth Amendment's knock and announce requirements, then they would almost certainly fail to do so when executing the warrant on Betton's home.

82.     In executing the Betton search warrant, Defendant Bishop did not instruct the DEU agents to follow the Fourth Amendment's knock and announce requirements.

83.     Defendant Guess executed his plan at approximately 2:50pm on April 16, 2015.

84.     Defendant BeLue drove a white, unmarked SUV directly onto the front yard of 602 Withers Swash Drive.  He stopped a few feet from the steps leading to the building's front porches.

85.     Betton's neighbor, Santos Garcia, had just arrived home and was working on his moped by his front porch steps.  Defendant BeLue and three other DEU agents quickly got out of the SUV, pointed weapons at Garcia, and ordered him to the ground.  Mr. Garcia immediately complied.

86.     Simultaneously, an unmarked silver pickup truck with extended cab pulled up to the curb in front of 602 Withers Swash Drive, and an unmarked red SUV and unmarked gray sedan pulled up beside the front yard of 602 Withers Swash Drive.  More armed agents poured out of those vehicles.

87.     The DEU agents were not identified as law enforcement officers.  They were not wearing law enforcement uniforms.  They were dressed casually, in mismatched clothing worn beneath unmarked bullet proof vests.  Some were wearing blue jeans.  Some were wearing backwards baseball caps.  One was wearing a mask.

88.     The DEU agents did not tell Garcia that they were law enforcement officers. Garcia did not know that the men were law enforcement officers.

89.     While Defendant Bishop pinned Garcia to the ground, four DEU agents armed with semi-automatic assault rifles ran onto Betton's front porch, including Defendants BeLue, Dennis, and Waddell.  Defendant Guess accompanied them with a battering ram.

90.     No one knocked on Betton's door.

91.     No one announced that the agents were law enforcement officers.

15

92.     No one tried to open Betton's door, which was unlocked.

93.     No one made any attempt to obtain peaceful entry into Betton's apartment.

94.     Instead, in a period of less than three seconds, Defendant BeLue opened Betton's screen door, and Defendant Guess ran onto the porch and smashed down Betton's front door with a battering ram.

95.     Defendants Waddell, BeLue, and Dennis immediately entered Betton's living room.  They were not wearing law enforcement uniforms.  They were not wearing any visible insignia indicating that they were law enforcement officers.  Defendant BeLue was wearing a baseball cap backwards, a short-sleeved blue shirt, and tan-colored pants.  Defendant Dennis was wearing no hat, a short-sleeved blue shirt, and khaki pants.  Defendant Waddell was wearing no hat, a black mask covering the bottom half of his face, a dark blue long-sleeved t-shirt, and light blue jeans.

96.     Waddell, BeLue, and Dennis were all armed with semi-automatic assault rifles, each loaded with a 30-round magazine, meaning that each agent could shoot 30 bullets, by pulling the trigger 30 separate times, without having to reload the weapon. A flashlight was affixed to each rifle in such a manner that the light would be shining directly where the rifle was pointed. All three DEU agents entered the apartment with their rifles raised up in front of their chests, pointing outward. Upon information and belief, the flashlights on Waddell's and Dennis's rifles were turned on.

97.     Betton was leaving his bathroom.  He saw BeLue, Dennis, and Waddell in his living room, wearing military gear and carrying assault rifles.

98.     Betton did not know who Defendants BeLue, Dennis, and Waddell were.  He did not know that they were law enforcement officers.

99.     Betton had a handgun in his waistband.  If he had reached for the gun to protect himself from the unknown armed intruders in his living room, he would have been justified in doing so.

100.     Within two or three seconds of Defendant Guess's breach of the door, Defendants BeLue, Dennis, and Waddell began firing at Betton with their semi-automatic assault rifles.

101.     Betton was hit and fell to the ground.

102.     Betton was plainly incapacitated after he fell to the ground.

103.     Defendants BeLue, Dennis, and Waddell had time to reassess the situation after Betton fell to the ground.  Nevertheless, they continued to fire.  Betton was hit by several shots fired after he fell to the ground.

104.     BeLue pulled the trigger nine separate times, shooting nine bullets at Betton. Dennis pulled the trigger ten separate times, shooting ten bullets at Betton. Waddell pulled the trigger ten separate times, shooting ten bullets at Betton.  Of the 29 bullets they collectively fired at Betton, nine hit him.  Although Defendants were only a few feet from Betton, 20 shots did not hit him and instead hit the ceiling, walls, and floor.  At least one bullet continued through Betton's back wall, crossed a basketball court, and hit the wall of a neighboring house.

105.     Defendants never identified themselves as law enforcement officers or issued any commands to Betton before opening fire.

106.     After shooting Betton, the officers collected a small quantity of marijuana from his home.  They found no drugs other than marijuana.

107.     After shooting Betton, Defendants laughed and gave each other high-fives in the front yard of the apartment.

108.    DEU Agents charged Betton with two counts of distribution of marijuana and one count of possession with intent to distribute marijuana.

**G.    Betton Is in a Coma for Six Weeks.**

109.    Betton was admitted to Grand Strand Regional Medical Center on April 16, 2015.

110.    Betton suffered from severe injuries, including multiple gunshot wounds in his left arm, right thigh, left thigh, back, and perirectal area; injuries to his liver, gallbladder, duodenum, small bowel, pancreas, and rectum; spinal injuries including the partial destruction of L2 and fractures of L5 and S1; a left femur fracture; and partial lung collapse.

111.    Betton's grievous injuries put him into a coma, beginning on the date he was admitted to the hospital.

112.    Over the next several weeks, Betton underwent multiple surgeries.  Doctors performed several exploratory laparotomies.  They removed his gallbladder, and removed portions of his bowel, colon, and rectum.  They fused his T11 and S1 vertebrae, and inserted a metal rod into his left leg to reinforce his broken femur.

113.    Approximately six weeks after the shooting, Betton awoke from his coma.

114.    Betton is six feet two inches tall.  He lost approximately fifty pounds while in the coma, and weighed approximately 120 pounds when he awoke.

115.    Betton is currently on at least seven medications as a result of Defendants' misconduct.  He has experienced waves of excruciating pain almost constantly since awaking from his coma.  He cannot use his bowels and wears a colostomy bag.  He is catheterized and has suffered multiple severe urinary tract infections.

116.    Betton lost the use of both of his legs.  He is currently capable of slight movements in his left leg; he cannot move his right leg at all.

117.    Betton's legs will be paralyzed for the rest of his life.

**H.    The DEU Lies to Conceal its Misconduct.**

118.    The DEU systemically tried to cover up the misconduct of its officers and agents.

119.    Defendants conspired and agreed to lie about the events of April 16 in order to cover up their misconduct.

120.    Immediately after the shooting, Defendants BeLue, Dennis, Guess, and Waddell claimed that Betton opened fire on officers when they entered his apartment and that they only shot Betton because they were under fire.

121.    Relying on Defendants' statements, news coverage immediately after the shooting stated the Betton shot at law enforcement officers.  Betton was widely portrayed as a violent would-be cop killer.

122.    Defendants' statements were false.  The South Carolina State Law Enforcement Division ("SLED") conducted an investigation into Betton's shooting.  The SLED investigation revealed that Betton did not fire any weapon.

123.    After their first explanation was proven false, Defendants changed their story and claimed that Betton pointed a gun at them when they entered his apartment.  They claimed that they only shot Betton because he was pointing a gun at them.

124.    Defendants' statements that Betton pointed a gun at them were also false. Although Betton had a gun in his waistband when he saw three armed intruders in his living room, he was shot before he could draw the weapon.

125.    DEU agents stated that Betton possessed his firearms unlawfully.  These statements were false.  Betton had not been convicted of any crime that made his possession of firearms unlawful.

126.     DEU agents stated that Betton was a fugitive with two active arrest warrants in Ohio.  This statement was false.  Betton was not a fugitive, and had no active arrest warrants in Ohio.

127.     Defendants and other DEU agents made multiple additional false statements to SLED investigators in an effort to cover up their misconduct.

128.     Defendant Bishop told SLED that DEU agents knocked and announced "Police Search Warrant" before breaching Betton's front door.

129.     Defendant BeLue told SLED that he announced "Police Search Warrant" as he opened Betton's screen door.

130.     Defendant Dennis told SLED that Defendant Guess knocked on Betton's door and yelled "Police Search Warrant" before ramming down the door.

131.     Defendant Guess told SLED that he knocked on Betton's door, announced "police search warrant," and that he only rammed down Betton's door after Betton failed to respond to his knock and announce.

132.     Defendant Waddell told SLED that he and others yelled "Police Search Warrant" as an agent knocked on the door, and that the officers were all wearing clearly marked clothing identifying them as police officers.

133.     Defendant Richardson made multiple false public statements to the media. Defendant Richardson falsely told the media that DEU agents only entered Betton's home after knocking and announcing, that Betton pointed his weapon at the police, and that Betton fired his weapon.

134.     Each of the statements described in paragraphs 128, 129, 130, 131, 132, and 133 was false.  Betton's surveillance cameras recorded the Defendants' entry.  The video shows that

no one knocked on Betton's door.  It shows that none of the Defendants were wearing clearly marked clothing identifying them as police officers.  It shows that Defendant BeLue said nothing as he opened Betton's screen door.   It shows that Defendant Guess ran onto Betton's front porch and immediately rammed down his door without knocking, announcing, or waiting for a response.

135.     A true and accurate copy of the relevant portion of the video taken by Betton's surveillance camera is attached and incorporated by reference as Exhibit A.

136.     At the time the Defendants made their statements, they knew the statements were false.

137.     Relying on Defendants' false statements, the SLED report found that the officers were justified in using deadly force against Betton.  Following the release of the SLED report, Betton was again portrayed as a violent criminal.  Multiple media sources characterized him as man who ignored officers' attempt to gain peaceful entry into his apartment, and who instead drew and pointed a gun at men who were clearly the police.

138.     Although multiple DEU agents were equipped with body-worn cameras during the Betton raid, none was turned on at the time of the entry and the shooting.  Defendant Knowles had specifically instructed DEU agents not to activate body-worn cameras provided by their Contributing Agency.  The two MBPD officers assigned to assist the ten DEU agents in the execution of the search warrant only turned on their body-worn cameras after Betton had been shot.

139.     After Defendants shot Betton, his upstairs neighbor stepped onto her balcony and began to take photographs of the DEU operation.  Defendants told her to go back inside her apartment, but she refused to do to.  Approximately one hour later, in an attempt to intimidate

her from cooperating with Betton, DEU agents entered her apartment without consent.  They searched her apartment for a reason to arrest her.  Ultimately, she was arrested for possessing a plate with drug residue.

140.    Even though Betton was comatose and paralyzed from the waist down, DEU agents handcuffed his ankle to his hospital bed.

141.    Law enforcement officers initially told Betton's mother that she was not allowed to visit him in the hospital.  Betton's mother was only permitted to visit her son after his lawyer intervened.

142.    The DEU wanted to have officers on the scene if Betton were to awake from his coma.  Upon information and belief, DEU officers and agents wanted to hear what Betton said about his shooting, and to tell him false versions of the events that were more favorable to the DEU.  To that end, law enforcement officers were kept by Betton's bed while Betton was in a coma.

143.    When Betton finally awoke, the law enforcement officer in his room repeatedly told Betton that he had been "in a shootout" with the police.  These statements were false, as Betton never pointed or fired a weapon at the police.

144.    As a direct result of the false statements of Defendants BeLue, Waddell, and Dennis, Defendant Guess wrongfully charged Betton with pointing and presenting a weapon at them.  These charges hung over Betton's head for over a year-and-a-half, until the South Carolina Attorney General's Office conducted an independent review and dismissed them in March 2017.

## I.    <u>The DEU Approves of the Defendants' Conduct.</u>

145.    The DEU knew that the SLED investigation was narrowly focused on whether the agents had committed a criminal offense in their shooting of Betton, and did not encompass whether the agents had violated Betton's constitutional rights, violated the policies of their Contributing Agencies, violated the policies of the DEU, or acted in any other way contrary to law or professional standards.

146.    Neither during nor after the SLED investigation did the DEU conduct any internal review of the conduct of DEU agents in the Betton raid.

147.    Although multiple DEU agents and the DEU Deputy Commander provided false information to SLED investigators during the SLED investigation, the DEU did not conduct any internal review of that conduct.

148.    Defendants Knowles and Richardson did not impose any discipline or other corrective action on Defendants Guess, Bishop, BeLue, Dennis, and Waddell for their conduct in the Betton raid.  Defendants Knowles and Richardson imposed no discipline on Deputy Commander Bishop and the DEU agents who participated in the Betton raid because Bishop and the participating DEU agents acted in accordance with DEU policies and practices, and because Defendants Knowles and Richardson believed that Bishop and the participating DEU agents did nothing wrong.

149.    The DEU did not impose any discipline or other corrective action on Defendants Bishop, Guess, BeLue, Dennis, and Waddell for providing false information in their statements to SLED.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983 – U.S. Const. Amend. IV – Unlawful Entry – Guess, Waddell, Dennis, and BeLue)**

150.    The allegations in the preceding paragraphs are incorporated by reference.

151.    This claim under 42 U.S.C. § 1983 is brought against Defendants Guess, Waddell, Dennis, and BeLue in their individual capacities.

152.    Defendants Guess, Waddell, Dennis, and BeLue intentionally executed a search warrant on Betton's home without first knocking, announcing themselves as law enforcement, and waiting a reasonable amount of time for Betton to respond before forcing entry into Betton's home.

153.    Defendants Guess, Waddell, Dennis, and BeLue were aware of no exigent circumstances indicating that knocking and announcing their presence would be dangerous or futile, or that it would inhibit the effective investigation of a crime.  They had no legal justification for entering Betton's home without first knocking, announcing, and waiting a reasonable amount of time for Betton to respond.

154.    Defendants' conduct was objectively unreasonable under the facts and circumstances then existing.

155.    Betton did not consent to Defendants' conduct described herein.

156.    Defendants were at all relevant times acting under color of state law.  Defendants Waddell and Guess were acting as officers with the Coastal Carolina University Department of Public Safety and the DEU.  Defendant Dennis was acting as an officer with the Horry County Sheriff's Office and the DEU.  Defendant BeLue was acting as an officer with the Myrtle Beach Police Department and the DEU.

157.    If Defendants had knocked and announced before ramming down Betton's door, Betton would have allowed them to execute the search and arrest warrants peacefully.

158.    If Defendants had announced that they were law enforcement officers before ramming down Betton's door, Betton would have voluntarily surrendered himself and his apartment.

159.    Defendants Guess, Waddell, Dennis, and BeLue's misconduct deprived Betton of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

160.    Betton's right not to be subjected to the misconduct of Defendants Blue, Dennis, Guess, and Waddell was clearly established at the time of the misconduct.

161.    Defendants Guess, Waddell, Dennis, and BeLue could reasonably foresee that their misconduct could result in bodily injury to Betton.

162.    As a direct and proximate result of their misconduct, Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life.

163.    The actions of Defendants Guess, Waddell, Dennis, and BeLue were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of Defendants' conduct, Betton is entitled to recover punitive damages.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – U.S. Const. Amend. IV – Unlawful Entry – Knowles)

164.    The allegations in the preceding paragraphs are incorporated by reference.

165.    This claim under 42 U.S.C. § 1983 is brought against Defendant Knowles in his individual capacity.

166.     As DEU Commander, Knowles intentionally promulgated, encouraged, condoned, and approved DEU agents' practice of violating the Fourth Amendment by:

a.     Executing search warrants through the use of SWAT-like tactics without legal justification;

b.     Developing plans for the execution of search warrants that required the use of unreasonable tactics and excessive force;

c.     Executing search warrants through means that were in their totality unreasonable and/or required the use of excessive force;

d.     Failing to knock when executing a search warrant;

e.     Failing to announce when executing a search warrant;

f.     When agents did knock and/or announce, failing to wait a reasonable amount of time before forcing entry; and

g.     Failing to clothe agents in a manner that plainly indicated that they were law enforcement officers.

167.     When Knowles promulgated, encouraged, condoned, and approved of DEU agents' practice of violating the Fourth Amendment, he could reasonably foresee that the practice would result in severe bodily and emotional injury to the occupants of searched dwellings, including Betton.

168.     Knowles knew that DEU agents consistently disregarded the Fourth Amendment, and knew that their conduct posed a pervasive and unreasonable risk of constitutional injury to citizens like Betton.

169.    Knowles' promulgation, encouragement, condonation, and approval of the practice of violating the Fourth Amendment were direct and proximate causes of Betton's injuries.

170.    Because Knowles intentionally promulgated, encouraged, condoned, and approved the practice of violating the Fourth Amendment, Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life.

171.    Defendant Knowles was at all relevant times acting under color of state law as DEU Commander.

172.    By knowingly and intentionally promulgating, encouraging, condoning, and approving the practice of violating the Fourth Amendment, Knowles deprived Betton of his rights under the Fourth and Fourteenth Amendment to the United States Constitution.

173.    Because Knowles knowingly and intentionally promulgated, encouraged, condoned, and approved the practice of violating the Fourth Amendment, in reckless disregard of Betton's constitutional rights, Knowles is liable in his individual capacity to Betton for compensatory damages under 42 U.S.C. § 1983.

174.    Defendant Knowles' actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of Defendant Knowles' conduct, Betton is entitled to recover punitive damages.

### THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983 – U.S. Const. Amend. IV – Unlawful Entry – Richardson)

175.    The allegations in the preceding paragraphs are incorporated by reference.

176.    This claim under 42 U.S.C. § 1983 is brought against Defendant Richardson in his individual capacity.

177.    As 15th Circuit Solicitor, Richardson intentionally promulgated, encouraged, condoned, and approved DEU agents' practice of violating the Fourth Amendment by:

      a.     Executing search warrants through the use of SWAT-like tactics without legal justification;

      b.     Developing plans for the execution of search warrants that required the use of unreasonable tactics and excessive force;

      c.     Executing search warrants through means that were in their totality unreasonable and/or required the use of excessive force;

      d.     Failing to knock when executing a search warrant;

      e.     Failing to announce when executing a search warrant;

      f.     When agents did knock and/or announce, failing to wait a reasonable amount of time before forcing entry; and

      g.     Failing to clothe agents in a manner that plainly indicated that they were law enforcement officers.

178.    When Richardson promulgated, encouraged, condoned, and approved of DEU agents' practice of violating the Fourth Amendment, he could reasonably foresee that the practice would result in severe bodily and emotional injury to the occupants of searched dwellings, including Betton.

179.    Defendant Richardson knew that DEU agents consistently disregarded the Fourth Amendment, and knew that their conduct posed a pervasive and unreasonable risk of constitutional injury to citizens like Betton.

180.     Richardson's promulgation, encouragement, condonation, and approval of the practice of violating the Fourth Amendment were direct and proximate causes of Betton's injuries.

181.     Because Richardson intentionally promulgated, encouraged, condoned, and approved the practice of violating the Fourth Amendment, Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life.

182.     Defendant Richardson was at all relevant times acting under color of state law as 15th Circuit Solicitor.

183.     By knowingly and intentionally promulgating, encouraging, condoning, and approving the practice of violating the Fourth Amendment, Richardson deprived Betton of his rights under the Fourth and Fourteenth Amendment to the United States Constitution.

184.     Because Richardson knowingly and intentionally promulgated, encouraged, condoned, and approved the practice of violating the Fourth Amendment, in reckless disregard of Betton's constitutional rights, Richardson is liable in his individual capacity to Betton for compensatory damages under 42 U.S.C. § 1983.

185.     Defendant Richardson's actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of Richardson's conduct, Betton is entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – U.S. Const. Amend. IV – Unlawful Entry – Bishop)

186.     The allegations in the preceding paragraphs are incorporated by reference.

187.     This claim under 42 U.S.C. § 1983 is brought against Defendant Bishop in his individual capacity.

29

188.    As Deputy DEU Commander, Bishop intentionally promulgated, encouraged, condoned, and approved DEU agents' practice of violating the Fourth Amendment by:

a.    Executing search warrants through the use of SWAT-like tactics without legal justification;

b.    Developing plans for the execution of search warrants that required the use of unreasonable tactics and excessive force;

c.    Executing search warrants through means that were in their totality unreasonable and/or required the use of excessive force;

d.    Failing to knock when executing a search warrant;

e.    Failing to announce when executing a search warrant;

f.    When agents did knock and/or announce, failing to wait a reasonable amount of time before forcing entry; and

g.    Failing to clothe agents in a manner that plainly indicated that they were law enforcement officers.

189.    When Bishop promulgated, encouraged, condoned, and approved of DEU agents' practice of violating the Fourth Amendment, he could reasonably foresee that the practice would result in severe bodily and emotional injury to the occupants of searched dwellings, including Betton.

190.    Bishop knew that DEU agents consistently disregarded the Fourth Amendment, and knew that their conduct posed a pervasive and unreasonable risk of constitutional injury to citizens like Betton.

191.    Bishop's promulgation, encouragement, condonation, and approval of the practice of violating the Fourth Amendment were direct and proximate causes of Betton's injuries.

192.     On April 16, 2015, Bishop knew that agents under his supervision would execute the search warrant on Betton's home without abiding by the Fourth Amendment.  Bishop did not require the agents to abide by the Fourth Amendment, and instead permitted, condoned, and ratified their unconstitutional conduct.

193.     Because Bishop intentionally promulgated, encouraged, condoned, and approved the practice of violating the Fourth Amendment, and because he permitted, condoned, and ratified the actions of agents under his supervision that were consistent with that practice, Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life.

194.     Defendant Bishop was at all relevant times acting under color of state law as DEU Commander.

195.     By knowingly and intentionally promulgating, encouraging, condoning, and approving the practice of violating the Fourth Amendment, Bishop deprived Betton of his rights under the Fourth and Fourteenth Amendment to the United States Constitution.

196.     Because Bishop knowingly and intentionally promulgated, encouraged, condoned, and approved the practice of violating the Fourth Amendment, in reckless disregard of Betton's constitutional rights, Bishop is liable in his individual capacity to Betton for compensatory damages under 42 U.S.C. § 1983.

197.     Defendant Bishop's actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of Defendant Bishop's conduct, Betton is entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION
**(42 U.S.C. § 1983 Monell Claim – U.S. Const. Amend. IV – Unlawful Entry – Knowles and Richardson)**

198.    The allegations in the preceding paragraphs are incorporated by reference.

199.    This claim under 42 U.S.C. § 1983 is brought against Defendant Knowles in his official capacity as DEU Commander and Defendant Richardson in his official capacity as 15th Circuit Solicitor.

200.    Defendant Knowles was responsible for the day-to-day operations of the DEU. Defendant Knowles' duties included training, supervising, and disciplining agents assigned to the DEU, and in establishing policies and procedures for conducting field operations, including the execution of search warrants.

201.    As 15th Circuit Solicitor, Defendant Richardson oversaw the DEU's operations. Defendant Richardson served on the board of the DEU, helped establish the DEU's law enforcement priorities, and could control the DEU's trainings, policies, and practices.

202.    The DEU did not properly train its agents in how to constitutionally execute search warrants.  Instead, the DEU maintained a pattern and practice of disregarding the Fourth Amendment.  The DEU's unlawful pattern and practice included:

a.    Executing search warrants through the use of SWAT-like tactics without legal justification;

b.    Developing plans for the execution of search warrants that required the use of unreasonable tactics and excessive force;

c.    Executing search warrants through means that were in their totality unreasonable and/or required the use of excessive force;

d.    Failing to knock before executing a search warrant;

e.    Failing to announce before executing a search warrant;

f.   When agents did knock and/or announce, failing to wait a reasonable amount of time before forcing entry after knocking and/or announcing; and

g.   Failing to wear plainly visible indication that agents were law enforcement officers.

203.   Defendants BeLue, Dennis, Guess, and Waddell's unlawful entry into Betton's home was a result of the DEU's pattern and practice of disregarding the Fourth Amendment. Defendant Knowles and Defendant Richardson are therefore liable in their official capacities for the violation of Betton's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

204.   As a direct result of the unconstitutional patterns and practices of the DEU, Julian Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life. Defendant Knowles and Defendant Richardson are thus liable to Betton in their official capacities pursuant to 42 U.S.C. § 1983.

### SIXTH CAUSE OF ACTION
**(42 U.S.C. § 1983 – U.S. Const. Amend. IV – Excessive Force – Defendants Waddell, Dennis, and BeLue)**

205.   The allegations in the preceding paragraphs are incorporated by reference.

206.   This claim under 42 U.S.C. § 1983 is brought against Defendants Waddell, Dennis, and BeLue in their individual capacities.

207.   Defendants Waddell, Dennis, and BeLue had no legal justification for shooting Betton.

33

208.     Betton did not pose an immediate threat to Defendants Waddell, Dennis, and BeLue.  An objectively reasonable officer in the Defendants' circumstances would not have concluded that a threat existed justifying the use of deadly force against Betton.

209.     Defendants Waddell, Dennis, and BeLue had no legal justification for continuing to shoot Betton after he fell to the floor.  Any threat posed by Betton ended when he fell incapacitated to the floor.  After Betton fell to the floor, an objectively reasonable officer in the Defendants' circumstances would not have concluded that a threat existed justifying the Defendants' continued use of deadly force.

210.     Defendants were at all relevant times acting under color of state law.  Defendant Waddell was acting as an officer with the Coastal Carolina University Department of Public Safety and the DEU.  Defendant Dennis was acting as an officer with the Horry County Sheriff's office and the DEU.  Defendant BeLue was acting as an officer with the Myrtle Beach Police Department and the DEU.

211.     Defendants' conduct was objectively unreasonable under the facts and circumstances then existing.  Betton did not consent to any of the Defendants' conduct described herein.

212.     Betton's right not to be subjected to such conduct was clearly established at the time of the misconduct.

213.     As a proximate result of Defendants' wrongful conduct, Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life.

214.    Defendants' actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of defendants' conduct, Betton is entitled to recover punitive damages.

## SEVENTH CAUSE OF ACTION
**(South Carolina Law – Assault – Defendants Guess, Waddell, Dennis, and BeLue)**

215.    The allegations in the preceding paragraphs are incorporated by reference.

216.    This claim is brought against Defendants Guess, Waddell, Dennis, and BeLue in their individual capacities.

217.    Defendants' conduct at 602 Withers Swash Drive placed Betton in reasonable fear of bodily harm.

218.    Defendants BeLue, Dennis, Guess, and Waddell's conduct at 602 Withers Swash Drive was undertaken with actual malice.

219.    As a proximate result of Defendants' wrongful conduct, Betton has suffered serious emotional distress, humiliation, and other damages.

220.    Defendants' actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of Defendants' conduct, Betton is entitled to recover punitive damages.

## EIGHTH CAUSE OF ACTION
**(South Carolina Law – Battery – Defendants Waddell, Dennis, and BeLue)**

221.    The allegations in the preceding paragraphs are incorporated by reference..

222.    This claim is brought against Defendants Waddell, Dennis, and BeLue in their individual capacities.

223.    Defendants unlawfully inflicted violence on Betton's person by shooting him nine times.

224.    Defendants shot Betton with actual malice.

225.    As a proximate result of Defendants' wrongful conduct, Betton has suffered serious physical injury, paralysis, medical expenses, life-care expenses, loss of income, emotional distress, humiliation, loss of reputation, and other damages.

226.    Defendants' actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of defendants' conduct, Betton is entitled to recover punitive damages.

### NINTH CAUSE OF ACTION
### (State Law – Trespass – Defendants Guess, Waddell, Dennis, and BeLue)

227.    The allegations in the preceding paragraphs are incorporated by reference.

228.    This claim is brought against Defendants Guess, Waddell, Dennis, and BeLue.

229.    Defendants interfered with Betton's right to the exclusive, peaceable possession of his property.

230.    Defendants trespassed on Betton's property with actual malice.

231.    As a proximate result of Defendants' wrongful conduct, Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life.

232.    Defendants' actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of defendants' conduct, Betton is entitled to recover punitive damages.

### TENTH CAUSE OF ACTION
### (State Law – Defamation – Defendants Knowles, Richardson, Bishop, Guess, Waddell, Dennis, and BeLue)

233.    Plaintiff has moved to dismiss his Tenth Cause of Action for Defamation, and retains this section solely to ensure consistent numbering.

## ELEVENTH CAUSE OF ACTION
### (State Law – Civil Conspiracy – Defendants Knowles, Bishop, Guess, Waddell, Dennis, and BeLue)

234.    The allegations in the preceding paragraphs are incorporated by reference.

235.    This claim is brought against Defendants Knowles, Bishop, Guess, Waddell, Dennis, and BeLue.

236.    After shooting Betton, Defendants conferred and agreed to engage in a conspiracy to cover up their misconduct.

237.    Defendants developed and agreed to their conspiracy for the purpose of protecting themselves and injuring Betton.

238.    Defendants' plan included each participant making false, defamatory statements about Betton, Betton's criminal history, and Betton's actions on April 16, 2015, along with false statements about their own actions on April 16, 2015.  Defendants coordinated their statements so that they would be consistent.

239.    Defendants' plan also included intimidating witnesses, separating Betton from his mother, and giving Betton false information about what occurred on April 16, 2015.

240.    Defendants executed their conspiracy.

241.    As a direct and proximate result of Defendants' conspiracy, Betton suffered general damages including emotional distress, humiliation, loss of reputation, as well as special damages including:

        a.    the loss of relationships with individuals who fear becoming the victims of additional government retaliation;

b.  the costs associated with defending criminal charges that would not have been brought absent the conspiracy, including attorney's fees, court costs, injury to reputation, and emotional damages;

c.  emotional damages caused by fearing additional governmental retribution;

d.  emotional damages caused by fearing for the safety of his loved ones;

e.  emotional damages caused by the loss of confidence in local government and the criminal justice system; and

f.  emotional damages caused by the inability to feel secure in his community.

242.  Defendants' actions were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.

## TWELFTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – U.S. Const. Amend. IV & XIV – Guess, Waddell, Dennis, BeLue, Bishop, and Knowles)

243.  The allegations in the preceding paragraphs are incorporated by reference.

244.  This claim under 42 U.S.C. § 1983 is brought against Defendants Guess, Waddell, Dennis, BeLue, Bishop, and Knowles in their individual capacities.

245.  Defendants Guess, Waddell, Dennis, BeLue, Bishop, and Knowles intentionally elected to use SWAT-like tactics and forcible, dynamic entry when executing the search warrant as a raid on Betton's home.

246.  The SWAT-like raid was unreasonable and constituted excessive force under the Fourth and Fourteenth Amendments.

247.  Defendants Guess, Waddell, Dennis, BeLue, Bishop, and Knowles intentionally agreed to conduct the raid without having conducted a meaningful pre-raid investigation.

248.     Defendants Guess, Waddell, Dennis, BeLue, Bishop, and Knowles had ample time to conduct a meaningful pre-raid investigation.  Their decision to conduct the raid without such an investigation was unreasonable under the Fourth and Fourteenth Amendments.

249.     Defendants Guess, Waddell, Dennis, BeLue, Bishop, and Knowles intentionally agreed to conduct the raid according to a plan which required the use of unreasonable means and excessive force.

250.     Defendants Guess, Waddell, Dennis, BeLue, Bishop, and Knowles executed the search warrant on Betton's apartment in a manner that was objectively unreasonable under the totality of the circumstances.  They had no legal justification for their conduct, including, but not limited to, their failure to consider alternatives to forcible entry, their failure to develop a plan for forcible entry, their failure to ensure individual officers had defined roles before executing the search warrant, their use of casual clothing instead of law enforcement uniforms, their failure to clearly mark themselves as law enforcement officers, their failure to knock, their failure to announce, their failure to wait a reasonable period of time after knocking and announcing before entering, their use of a battering ram to knock down an unlocked door, and their use of semi-automatic assault rifles.

251.     Betton did not consent to Defendants' conduct described herein.

252.     Defendants were at all relevant times acting under color of state law.  Defendants Waddell and Guess were acting as officers with the Coastal Carolina University Department of Public Safety and the DEU.  Defendant Dennis was acting as an officer with the Horry County Sheriff's Office and the DEU.  Defendant BeLue was acting as an officer with the Myrtle Beach Police Department and the DEU.  Defendants Bishop and Knowles were acting as officers of the DEU.

253.    If not for Defendants' unreasonable conduct, Defendants could have executed the search and arrest warrants peacefully.

254.    Betton's right not to be subjected to the misconduct of Defendants Blue, Dennis, Guess, Waddell, Bishop, and Knowles was clearly established at the time of the misconduct.

255.    Defendants Guess, Waddell, Dennis, BeLue, Bishop, and Knowles could reasonably foresee that their misconduct could result in bodily injury to Betton.

256.    As a direct and proximate result of their misconduct, Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life.

257.    The actions of Defendants Guess, Waddell, Dennis, BeLue, Bishop, and Knowles were done maliciously, willfully, or wantonly, or in a manner that demonstrates a reckless disregard for Betton's rights.  As a result of Defendants' conduct, Betton is entitled to recover punitive damages.

### THIRTEENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 <u>Ratification</u> Claim – U.S. Const. Amend. IV – Unlawful Entry – Knowles and Richardson)

258.    The allegations in the preceding paragraphs are incorporated by reference.

259.    This claim under 42 U.S.C. § 1983 is brought against Defendant Knowles in his official capacity as DEU Commander and Defendant Richardson in his official capacity as 15th Circuit Solicitor.

260.    Defendant Knowles was responsible for the day-to-day operations of the DEU. Defendant Knowles' duties included training, supervising, directing, and disciplining agents assigned to the DEU, and in establishing policies and procedures for conducting field operations, including the execution of search warrants.

261.    As 15th Circuit Solicitor, Defendant Richardson oversaw the DEU's operations. Defendant Richardson served on the board of the DEU, helped establish the DEU's law enforcement priorities, and could control the DEU's trainings, policies, and practices.

262.    Defendants Knowles and Richardson and the Governing Board of the DEU were aware of circumstances surrounding the raid on Julian Betton's apartment, were aware of the SLED investigation into that raid, and were aware that DEU Agents misrepresented facts in their statements to SLED.

263.    Defendants Knowles and Richardson and the Governing Board of the DEU did not conduct any internal investigation of the raid on Betton's home or the misrepresentations made by officers during the SLED investigation.

264.    Defendant Knowles and Richardson and the Governing Board of the DEU did not discipline, reprimand, or otherwise initiate any corrective conduct as a result of the raid on Betton's home or the misrepresentations made by agents and the Deputy Commander during the SLED investigation.  They failed to do so because they recognized that Defendants' conduct was consistent with the DEU's policies, patterns, and practices, and because they approved of the Defendants' conduct.

265.    The DEU ratified the Defendants' misconduct.

266.    Because the DEU ratified the Defendants' misconduct, the DEU is itself charged with and subject to liability for that misconduct.

## FOURTEENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – U.S. Const. Amend. IV – City of Myrtle Beach)

267.    The allegations in the preceding paragraphs are incorporated by reference.

268.    This claim is brought against Defendant City of Myrtle Beach.

269.     The City of Myrtle Beach authorized the DEU to enforce drug laws within its municipal boundaries.

270.     The City of Myrtle Beach gave its authority to exercise police powers within the corporate limits of Myrtle Beach to the DEU

271.     The City of Myrtle Beach contributed its employees to the DEU to assist the DEU in enforcing drug laws within its municipal boundaries.

272.     The City of Myrtle Beach deferred to the DEU on all matters of law enforcement policies and practices and on all matters of personnel supervision, including the unconstitutional policies, patterns, and practices described above.

273.     Employees of the City of Myrtle Beach assisted the DEU in engaging in the unconstitutional policies, patterns, and practices described above.

274.     The City of Myrtle Beach knew or should have known of the DEU's unconstitutional policies and practices, and knew or should have known that the unconstitutional conduct would likely result in serious bodily injury.

275.     The City of Myrtle Beach was deliberately indifferent to the risk that the DEU's unconstitutional policies and practices would result in injuries such as those suffered by Julian Betton.

276.     As a proximate result of the City of Myrtle Beach's conduct, Betton was shot nine times, suffered serious physical and emotional injury, and will be paralyzed from the waist down for the rest of his life.

## FIFTEENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – U.S. Const. Amend. IV – City of Myrtle Beach)

277.     The allegations in the preceding paragraphs are incorporated by reference.

278.     This claim is brought against Defendant City of Myrtle Beach.

42

279.    The City of Myrtle Beach had final policymaking authority for the enforcement of drug laws within its municipal boundaries.

280.    The City of Myrtle Beach ratified the DEU Agreement and delegated its final policymaking authority to the DEU.

281.    By delegating its final policymaking authority to the DEU, constitutional violations committed by the DEU through the exercise of that authority are directly attributable to the City of Myrtle Beach.  The City of Myrtle Beach therefore shares liability for each of the constitutional claims raised against Defendants Knowles and Richardson in their official capacity.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff prays for the following relief:

1.    Compensatory damages from Defendants, jointly and severally, in an amount to be determined at trial;

2.    Punitive damages from Defendants, jointly and severally, in an amount to be determined at trial;

3.    Special damages from Defendants, jointly and severally, in an amount to be determined at trial;

4.    Reasonable attorneys' fees and expenses from Defendants under 42 U.S.C. § 1988;

5.    Costs of court and interest as allowed by law;

6.    A trial by jury on all contested issues of fact; and

7.    Such other and further relief as the Court may deem just and proper.

This the __ day of May, 2017.

PATTERSON HARKAVY LLP

BY:/s/ Burton Craige_____
    Burton Craige, NC Bar No. 9180
    *(admitted pro hac vice)*
    bcraige@pathlaw.com
    Bradley J. Bannon, NC Bar No. 24106
    *(admitted pro hac vice)*
    bbannon@pathlaw.com
    Narendra K. Ghosh, NC Bar No. 37649
    *(admitted pro hac vice)*nghosh@pathlaw.com
    Paul E. Smith, NC Bar No. 45014
    *(admitted pro hac vice)*
    psmith@pathlaw.com
    100 Europa Dr., Suite 420
    Chapel Hill, North Carolina 27517
    (919) 942-5200


LAW OFFICE OF JONNY MCCOY

BY:/s/ Jonny McCoy_____
    Jonny McCoy, SC Bar No. 77540
    District Court Identification Number: 12059
    jonnymccoy@gmail.com
    1240 21st Ave. North, Suite 105
    Myrtle Beach, South Carolina 29577
    (843) 848-7325

    *Counsel for Plaintiff Julian Ray Betton*

# EXHIBIT A – Video Recording, 4/16/2015