UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| JULIAN RAY BETTON, Plaintiff | ) | C/A No.: 4-15-CV-04638-AMQ-KDW |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| BILL KNOWLES in his individual | ) | |
| capacity and official capacity as | ) | |
| Commander of the 15th Circuit Drug | ) | |
| Enforcement Unit Task Force; JIMMY | ) | |
| RICHARDSON II in his individual | ) | |
| capacity and official capacity as 15th | ) | |
| Circuit Solicitor; DEAN BISHOP in his | ) | |
| individual capacity; CHAD GUESS in his | ) | |
| individual capacity; FRANK WADDELL | ) | |
| in his individual capacity; CHRIS DENNIS | ) | |
| in his individual capacity; DAVID BELUE | ) | |
| in his individual capacity; and the City of | ) | |
| Myrtle Beach,[1] | ) | |
| Defendants. | ) | |

## I.    Introduction

Plaintiff Julian Ray Betton filed this action under 42 U.S.C. § 1983 alleging that

Defendants David Belue ("Belue") and the City of Myrtle Beach, South Carolina ("Myrtle Beach"

or "the City") violated his Fourth and Fourteenth Amendment rights during the execution of a

search warrant that resulted in severe injuries that, among other things, rendered Betton a

---

[1] Betton filed his initial Complaint on November 17, 2015, naming Knowles, Richardson, Bishop, Guess, Waddell, Dennis and Belue as defendants. ECF No. 1. On May 24, 2017, Betton filed a First Amended Complaint in which he added The City of Myrtle Beach as a defendant. ECF No. 102. On March 27, 2018, Knowles, Richardson, Bishop, Guess, Waddell, and Dennis were terminated as parties by Stipulation of Dismissal with prejudice. ECF No. 168. Defendants David Belue and the City of Myrtle Beach remain parties to this case.

paraplegic. Specifically, against Belue, Betton brings a section 1983 claim for unlawful entry, excessive force and claims under the Fourth and Fourteenth Amendments for tactical excessive force. Betton also brings state law claims against Belue for assault, battery, and trespass.[2] Against Myrtle Beach, Betton brings claims under section 1983 for Fourth Amendment violations alleging that it is liable as a municipality for the actions of the Drug Enforcement Unit ("DEU").

Presently before the court is Belue's motion for summary judgment. ECF No. 149. Also before the court is Myrtle Beach's motion for summary judgment. ECF No. 142. This Report and Recommendation ("R&R") addresses both motions. The undersigned recommends that Belue's motion for summary judgment be granted in part and denied in part. The undersigned also recommends that Myrtle Beach's motion be denied.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(f) (D.S.C.). Because these Motions are potentially dispositive of Plaintiff's claims, this R&R is entered for review by the district judge.

## II.     Factual Background

In 2005, the City of Myrtle Beach, South Carolina, along with other counties and municipalities in South Carolina's 15th Judicial Circuit, joined to form the 15th Circuit DEU, a multi-jurisdictional task force operating under South Carolina Code Ann. § 23-1-210, et seq.[3] The

---

[2] In his Response, Betton has stated that he is not contesting Belue's motion with respect to the claim for civil conspiracy under state law. ECF No. 163 at 33.

[3] Section 23-1-210 was repealed and replaced by S.C. Code § 23-20-10, the "Law Enforcement Assistance and Support Act." ECF No. 158-11 at 1-10.

DEU enables the participating counties and municipalities to pool their resources to carry out the

DEU's

> mission [ ] to identify, investigate, and prosecute individuals who participate in illegal drug manufacturing, cultivation, distribution and/or trafficking within the 15th Judicial Circuit, Horry/Georgetown Counties. Specifically, DEU intends to combine the intelligence and investigative powers of the above referenced law enforcement agencies in an effort to enhance and streamline the drug investigations in Horry and Georgetown Counties.

ECF No. 163-29 at 2.

While the City has participated in the DEU since its inception, on September 23, 2014, the

Myrtle Beach City Council entered an agreement with other counties and municipalities to ratify

the 15th Circuit DEU. Under the agreement's terms

> [t]he parties . . . understand and agree that the governing bodies of each participating Law Enforcement Agency must sign off on, and approve this Agreement before it is considered to be properly executed. By law, this is a duty that cannot be delegated to the Chiefs or heads of the respective Law Enforcement Agencies.

ECF No. 163-29 at 1. The DEU agreement also provided for "[a] Governing Board, consisting of

the Fifteenth Circuit Solicitor, and the head of each participating Law Enforcement Agency [that]

will set policy, approve the budget, and provide general direction for DEU operations." ECF No.

163-29 at 2. Warren Gall ("Chief Gall"), the Chief of Police for the City of Myrtle Beach, was a

founding member and Vice-Chair of the DEU's Governing Board. ECF No. 158-9 at 16; 158-11

at 15.

The City also agreed that when it assigned its own agents to the DEU, those agents would

"adhere to the DEU policies and procedures" and would "report to the DEU Commander and the

Governing Board," with "direct Agency supervision [being] left to the DEU Commander or

Deputy Commanders." *Id* at 3. And the City agreed that it would "assume all civil liability for the actions of their respective assigned law enforcement agents while they are acting within the course and scope of their duties." *Id.* at 4.

Agent Chad Guess ("Guess") was the case agent for the investigation and was responsible for obtaining and executing the search warrant for Betton's residence. ECF No. 163-10 at 6, 9. To assist him in the investigation, Agent Guess enlisted a Confidential Informant ("CI") who provided information that served as the basis for the search warrant. ECF No. 163-21 at 1-3; 163-10 at 6. On March 24, 2015 and April 7, 2015, the CI went to Betton's apartment and made two separate purchases of seven and eight grams of marijuana. ECF No. 163-21 at 1-3. Before each transaction, Guess gave the CI $100.00 to use to make the purchases. *Id.* With the help of the confidential informant, Guess gleaned that Betton had two guns, had installed video cameras at the front door, and that he might have had an outstanding warrant for his arrest in another state.[4] ECF No. 163-21 at 1-3; ECF No. 163-14 at 3. He also learned that Betton did not have a car and regularly walked to a nearby store. ECF No. 158-10 at 6, 9; ECF No. 158-7 at 9; ECF No. 163-14 at 3. On the basis of this information, Guess obtained the warrant to search Betton's apartment. ECF No. 163-19 at 1-6. The warrant was a standard knock and announce warrant, and it authorized the following:

> DESCRIPTION OF PREMISES (PERSON, PLACE OR THINGS) TO BE SEARCHED
>
> 602 Withers Swash Dr. Apt 2 Myrtle Beach, SC 29577. The building is a four sided light gray in color with white trim two story building that has the numbers 602 across the front middle of the building, which faces Withers Swash Dr. The building faces east and is located at the eastern most intersection of 3rd Ave S and Withers Swash Dr. Myrtle Beach, SC. The residence to be searched is

---

[4] The record indicates that Betton obtained the guns and security system after he was robbed in early 2014. Betton Dep. 68-69, ECF No. 163-6 at 4-5. Betton states that he never fired the weapons. Betton Dep. 68, 215, ECF No. 163-6 at 4, 19.

4

> apartment 2, which is the lower right apartment when facing the
> front of the building. There is a set of brick steps that lead to the
> covered front porch. Once located at the top of the brick steps, the
> front door of apartment 2, along with a screen door attached, is
> located directly in front and is labeled with a "2." There is a double
> window located to the right of the front door and a single window
> located further right.

ECF No. 163-19 at 1-6. Under "Description of Property," among the listed items are "[a]ny and

all quantities of illegal drugs to include but not limited to marijuana . . . ." ECF 163-19 at 2.

Guess developed the plan for the raid that DEU Commander William Knowles

("Knowles") approved. Knowles Dep. 157, ECF 158-11 at 28. According to his plan, DEU agents

were assigned to entry and perimeter teams. Guess assigned himself the responsibility of deploying

the battering ram. The agents assigned to the entry team were Waddell, Dennis, Brummett, and

Defendant Belue. ECF No. 163-5 at 33. Guess gave no DEU agent the responsibility of knocking

and announcing. ECF No. 163-4 at 1, ¶ 7; ECF No. 163-10 at 10.

Betton's surveillance cameras recorded the events that took place as the DEU arrived at his

home at approximately 2:57pm on April 16, 2015. The recordings are video only. The undersigned

reviewed the two video recordings of the events and describes them as follows:

> In daylight hours and with a video timestamp that reads 14:57:43,
> Video 1 shows a white unmarked SUV parked at the foot of the steps
> leading to Betton's porch. Two white lights seemingly attached to
> the interior of the windshield on the front passenger's side of the
> SUV are alternately blinking. There are no lights on the top of the
> white SUV or on any of the other unmarked cars that appear in video
> 2. The video reveals that a man, later identified as Betton's neighbor
> Santos Garcia, was standing on the steps leading to the porch as the
> SUV arrived. Belue is the first of the four agents to exit the SUV,[5]
> and he is holding his semi-automatic rifle. He is wearing a baseball
> cap that he has on backwards. He walks around the front of the SUV
> and approaches the steps leading to the porch, and he seems to
> instruct Garcia to get down. Belue is the first to the steps, and he

---

[5] Belue Dep. 193, ECF No. 163-5 at 55.

climbs them. He is the first on Betton's porch and the first to his door. He opens the screen door, and two officers follow him onto the porch and move to its opposite side. As they do, Belue steps to the side. Belue does not knock on the screen door; he does not knock on the interior door; and he does not check to see whether or not the interior door is unlocked. There is no indication that Belue announces his or the DEU's presence.

Guess, the fourth officer on the porch, approaches with his battering ram, swings it, and moves in the direction of Betton's door. None of the officers are wearing uniforms, but they are wearing flak jackets and at least one appears to have some sort of insignia on the front. At this point, Video 1 ends, at 14:57:55.

Video 2 shows a burgundy sedan parked in the drive way next to the house. A burgundy SUV drives up and one officer exits the vehicle. A grey/black sedans pulls up a few seconds later, and two officers exit the sedan.

As the video depicts the agents running towards the house, it also depicts an officer with a cap on backwards moving across the porch and opening the screen door. This officer is Agent Belue. Once the door is open, the image is filtered through the screen on the screen door. Two officers then move to the opposite side of the porch, and Guess enters the frame moving toward Betton's interior door. At this point Video 2 ends.

ECF No. 158-15 at 1; ECF No. 158-33 at 1. There is no video footage of the events that occurred in Betton's apartment. But once inside, the officers opened fire and discharged a total of twenty-nine bullets. ECF No. 163-26 at 5, n. 1. Nine of those bullets hit Betton. ECF No. 163 at 1, ¶ 1.

According to Betton, as the entry team was entering his apartment he was coming out of his bathroom and was entering his hallway. ECF No. 163-6 at 11. He heard no one announce their presence, but he did hear the door being kicked in or rammed open, saw shadows moving and was startled. ECF No. 163-6 at 11. At that point he reached for the gun in his waistband, and when he regained consciousness, he was in the hospital. ECF 163-6 at 10.

Within hours of the shooting, the South Carolina Law Division ("SLED") began an investigation into any possible criminal wrongdoing at the scene. ECF No. 163-11 at 16. They first

interviewed Garcia, the individual seen in the video standing on the stairs as the DEU team arrives. ECF No. 163-3 at 1, ¶ 7. According to Garcia, the officers neither knocked nor announced before entering Betton's apartment. *Id.* at ¶ 4.

The next day, SLED interviewed and took statements from Agents Guess, Dennis, Waddell, Bishop, and Belue. ECF No. 163-5 at 54. The agents reported to SLED that they knocked, announced themselves, and waited a reasonable time at Betton's door before entering. Some of their statements are provided below:

- Agent Belue:    "I pulled the screen door open and announced in a loud voice 'police, search warrant.' The rest of the team had also made their way onto the porch and Agent Guess approached the front door. As Guess approached the wood door he knocked and announced again 'police, search warrant.' Upon no answer at the door force was utilized to gain entry into the apartment."
- Agent Waddell:    "Agent Belue pulled open the screen/storm door to expose the primary entrance door. Another agent knocked and all agents, including myself, began to yell 'Police Search Warrant' prior to making entry."
- Agent Bishop:    "At this time, I heard the entry team knock on the door of apartment #2 and yell 'Police! Search warrant!' A few seconds later the breaching ram hit the door of the apartment."
- Agent Guess:    "At this point, I approached the front door, in which we had already knocked and announced 'police search warrant' with no response, and hit it with a ram. I yelled 'police search warrant' as the door opened up."

ECF No. 163-18 at 4 (Belue); ECF No. 163-16 at 3 (Waddell); ECF No. 163-25 at 2 (Bishop); ECF No. 163-22 at 3 (Guess). Around a month later, in May 2015, Belue repeated to Lt. Chestnut of the Myrtle Beach Police Dept. that he knocked and announced before entering Betton's apartment. Belue Dep. 193-94, ECF No. 163-5 at 55-56. Belue also made a written statement in which he claimed that Betton not only pointed but also fired his gun. ECF No. 163-18 at 4. To Lt. Chestnut of the Myrtle Beach Police Department, Belue stated that he "distinctly remember[ed]"

Betton firing his weapon. Belue Dep. 194-95, 198, ECF No. 163-5 at 56-57, 60-61. The 15th Circuit Solicitor charged Betton with pointing and presenting a weapon. ECF No. 163-2 at 1, ¶ 5.

A review of the video footage reveals that the statements of Agents Guess, Waddell, Bishop and Belue were false. Chief Gall reviewed the footage of the events leading up to the shooting and concluded that, "the agents approaching the door are not announcing. In fact, it appears that their mouths are not moving as Agent Belue opens the screen door and Agent Guess simultaneously rams the door." Gall Dep. 91, ECF No. 163-9 at 10. SLED's analysis of the ballistics of Betton's gun also reveals that Belue's claim that Betton fired his weapon was false. Pl's Expert Rpt., ECF No. 163-26 at 5.  According to the SLED report, Betton fired no shots. *Id.* The S.C. Attorney General's Office subsequently dropped the pointing and presenting charges against Betton. ECF No. 163-2 at 1, ¶ 5.

On July 15, 2015, in the wake of the shooting incident, Chief Gall realized and communicated in an email exchange with Commander Knowles that the DEU manual of Standard Operating Procedures omitted the requirement and instructions that, under the Fourth Amendment, officers must knock, announce and wait a reasonable period of time before entering when executing a standard search warrant. ECF No. 158-25. The record also highlights other operational deficiencies with respect to Fourth Amendment requirements. For example, Agent Belue indicated that he did not know how long he should wait before forcing entry into a home, and he testified that neither the MBPD nor DEU had ever trained him on how long to wait. Belue Dep. 77, ECF No. 163-5 at 26. Agent Dennis testified that he included the time "that you get out of your vehicle and you make your presence known" before knocking and announcing as a part of the reasonable period of time to wait before entering. Dennis Dep. 180-81, ECF No. 163-8 at 9-10. Agent Guess was simply unaware there was any requirement to knock and announce. He stated that, "[i]t's not

the law to knock and announce. You know, it's just not. It's the officer's discretion, each dictate determines itself." Guess Dep. 156-57, ECF No. 163-10 at 14-15.

On January 25, 2017, during his deposition almost two years after the shooting, Commander Knowles revealed that no corrective action had taken place in response to the events in the present case. ECF No. 158-9 at 32. When asked, "DEU has not disciplined any officer who participated in the Betton raid, correct?" Commander Knowles answered, "No sir." Knowles Dep. 52, ECF No. 158-11 at 17.  He was then asked "Why not?" *Id.* Because, according to Commander Knowles, "[t]hey didn't do anything wrong." *Id.*

Betton suffered severe injuries as a result of the shooting. Betton Decl., ECF No. 163-2 at 1. In the aftermath of the events of April 16, 2015, Betton spent about six weeks in the hospital in a medically induced coma, and he endured multiple surgeries. *Id.* Betton's injuries also rendered him permanently paralyzed and no longer able to walk. *Id.*

## III.    Standard of Review

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive

the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 251. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989).

## IV.     Unlawful Entry

### a.  Law

The Fourth Amendment's guarantee of the people's right "to be secure in their persons, houses, papers, and effects," protects individuals living in a large number of legal arrangements. U.S. Const. amend. IV. A Fourth Amendment reasonableness standard governs the lawfulness of an entry by state officers executing a search warrant. In *Wilson v. Arkansas*, the Supreme Court held that whether officers "knock and announce" their presence is part of the reasonableness test under the Fourth Amendment. 514 U.S. 927, 929 (1995); *Bonner v. Anderson*, 81 F.3d 472, 474 (4th Cir. 1996) ("The knock and announcement requirement is an element of the Fourth Amendment reasonableness inquiry."). In *Wilson*, the Supreme Court found: "[W]e have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure." 514 U.S. at 934. However, the *Wilson* Court emphasized that there is no "rigid" or "inflexible" rule of announcement. *Id.* The *Wilson* Court specifically named the following three exceptions to the "knock-and-announce" rule: (1) "circumstances presenting a threat of physical violence," (2) "cases where a prisoner escapes from [law enforcement] and retreats to his

dwelling," and (3) circumstances where "evidence would likely be destroyed if advance notice were given." *Id.* at 936.

The Supreme Court analyzed the rule further in the case of *Hudson v. Michigan*, 547 U.S. 586 (2006). The *Hudson* Court held that the one interest protected by the knock-and-announce rule "is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Id.* at 594. Additionally, protection of property or "[b]reaking a house (as the old cases typically put it)" is another interest and "gives individuals the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." *Id.* (internal citations omitted). Finally, the *Hudson* Court reasoned:

> [T]he knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the opportunity to prepare themselves for the entry of the police.  The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed. In other words, it assures the opportunity to collect oneself before answering the door.

*Id.* (internal citations omitted); *see also Bonner*, 81 F.3d at 475 ("The rule is designed to satisfy three purposes: (1) protecting the safety of occupants of a dwelling and the police by reducing violence; (2) preventing the destruction of property; and (3) protecting the privacy of occupants.").

The Supreme Court has also held that there is no bright-line rule concerning the manner in which law enforcement must knock and announce prior to executing the search warrant. *See United States v. Banks*, 540 U.S. 31, 35–36 (2003) ("Although the notion of reasonable execution must therefore be fleshed out, we have done that case by case, largely avoiding categories and protocols for searches."); *Ohio v. Robinette,* 519 U.S. 33, 39 (1996) ("[W]e have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry"). Rather, the court instructed that each case, and the reasonableness of the officers' actions, must be

determined on a case-by-case basis. *See Banks*, 540 U.S. at 36 ("[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones."). Therefore, absent exigent circumstances, the Fourth Amendment requires law enforcement officers to knock and announce their presence when executing a search warrant. Based on these instructions, the Fourth Circuit "requires a court to analyze the facts of each case to determine that the officers had some particularized basis for their suspicion." *United States v. Dunnock*, 295 F.3d 431, 434 (4th Cir. 2002).

### b. The Parties' Arguments

Belue argues that he cannot be held liable under § 1983 for the actions of the other officers at the scene because a defendant's conduct should be examined on an individual and personal basis. ECF No. 149-1 at 6. According to Belue, his actions should be analyzed from three perspectives: actions before entry, actions during entry, and his own actual entry. ECF No. 149-1 at 7. Belue argues that his actions before entry consisted of arriving at the police station and participating in a meeting in which he learned that he and his fellow officers were executing a standard search warrant requiring that they knock, announce, and wait a reasonable time before entering Betton's apartment. *Id*. Belue also states that he reviewed Guess's Operating Plan for the raid and that he learned that he was assigned to the entry team. *Id.* He also states that he was aware that during the pre-raid meeting no one was assigned to knock and announce upon arrival at Betton's door. *Id.* Finally, he testified that he announced his presence as he pulled the screen door. *Id.* at 8.

Belue next argues that merely opening the screen door without knocking and announcing is not a Fourth Amendment violation. ECF No. 149-1 at 8. Belue points to the testimony of Plaintiff's expert who stated that opening a screen door without knocking and announcing is not a Fourth Amendment violation. *Id.* In his reply brief, he also highlights his own expert's testimony that it is best not to stand in front of doors when executing search warrants. ECF No. 166 at 4.

Belue next addresses his potential liability as a bystander. ECF No. 149-1 at 9-11. Belue concedes that as a member of the DEU he had a bystander's duty to prevent an unlawful entry into Betton's residence. ECF 149-1 at 9. But according to Belue, he did not violate that duty because he did not know that Guess would ram through Betton's door without knocking, announcing and waiting a reasonable time. *Id.* In essence, he argues that he is not liable for choosing not to act because he had neither the notice, power, nor the ability to prevent the unlawful actions of his fellow officers. *Id.* at 10.

Finally, Belue argues that the threat of violence and a reasonable suspicion that a crime was taking place when his colleagues entered created an exigent circumstance that justified his failure to knock and announce before entry into Betton's apartment. *Id.* at 11-12. These acts, according to Belue, did not amount to a constitutional violation. *Id.*

Betton argues that Belue is personally liable because he was a direct personal participant in the raid. ECF No. 163 at 16-17. Betton argues that Belue was directly involved in all aspects of the raid and was a direct participant in the entry. *Id.* Betton cites as support the fact that Belue participated in the pre-raid briefing, was assigned to the entry team, knew that Guess did not assign any agent the responsibility of knocking and announcing, and, according to Betton, it is significant that he was the first to the door, opened the screen door without knocking, chose not to knock on the main door and did not try to open or check to see if Betton's door was unlocked before his

13

fellow officers rammed through the interior door and into Betton's residence. *Id.* Betton argues that additional evidence of Belue's direct participation is that he held the screen door open for Guess to ram through and that while he claimed he announced, the video record and the testimony of Chief Gall shows that he did not. ECF No. 163 at 17.

In support of his argument concerning Belue's culpability, Betton also points to DEU agent testimony. First, he points to the deposition testimony of Guess who stated that "'[t]he first person knocks on the door,'" and Guess's acknowledgement that Belue was the first to the door. ECF No. 163 at 20. In Belue's deposition he was asked how, when there is no specific assignment to knock and announce, a DEU team member would ". . . know who would do that." Belue Dep. 74, ECF No. 163-5 at 23. Belue answered, "[t]ypically, it's one of the people at the front of . . . the residence knocks on the door. You're at the door, so you knock on it." Belue Dep. 74-75, ECF No. 163-5 at 23-24.  Betton argues that based on this testimony, a jury could conclude that Belue was more culpable than anyone else involved in the raid. ECF No. 163 at 20.

Finally, Betton argues that Belue is liable because he was involved in a joint agreement to engage in Fourth Amendment violations. ECF No. 163 at 22-24. That is, there were joint and overt acts that reasonably led to the inference of agreement. ECF No. 163 at 22-23. He claims that there is ample evidence of a conspiracy and that the post raid cover-up buttresses evidence of collusion. ECF No. 163 at 23.

### c.  Application of Law to the Facts

The undersigned recommends that a reasonable jury could find that Belue was a direct participant in the alleged unlawful entry into Betton's residence. According to the Fourth Circuit in *Sales v. Grant*, "the § 1983 causation language, 'subject[ed] or caused[d] [them,]' imposes liability not only for conduct that directly violates a right but for conduct that is the effective cause

of another's direct infliction of the constitutional injury . . . '[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" 158 F.3d 768, 776 (4th Cir. 1998) (quoting *Gutierrez-Rodriguez v. Cartegena,* 882 F.2d 553, 560-61 (1st Cir. 1989)). The court continues: "[t]his principle of effective causation by indirect means, grounded in the literal language of § 1983 and in general tort law has been widely recognized and applied in § 1983 litigation." *Id.*

The undersigned has reviewed the video footage from Betton's apartment and disagrees with Belue's assertion that he is not individually liable because he merely opened the screen door and was a bystander. Belue has stated that he participated in the pre-raid briefing and was assigned to the entry team. ECF No. 163-5 at 18-19. As the video shows, Belue drove DEU agents to Betton's apartment, and upon getting out of the SUV, he was the first on Betton's porch and the first to the door. ECF No. 163-15. The video also shows that Belue did not knock on either the screen door or the interior door before Guess rammed through the interior door. Belue testified that there was no specific assignment concerning who would be responsible for knocking. ECF No. 149-19 at 74-75. And again, when asked how one should know who would knock, he answered "[t]ypically, it's one of the people at the front of—front of the—residence knocks on the door. You're at the door, so you knock on it." ECF No. 149-19 at 74-75, ll. 23-35. Guess also testified that "the first person knocks on the door." ECF No. 163-10 at 13. Belue was the first person at the door, but he failed to knock.

As for announcing, Belue initially claimed that he announced their presence once he got to Betton's door. ECF No. 163-5 at 28. The undersigned has reviewed the video evidence, and it indicates that neither Belue nor his fellow officers announced before entering. According to the

testimony of Chief Gall, "the agents approaching the door are not announcing. In fact, it appears that their mouths are not moving as Agent Belue opens the screen door and Agent Guess simultaneously rams the door." ECF No. 163-9 at 10.

When viewed in a light most favorable to Betton, the evidence demonstrates that Belue, as a member of the entry team who drove the agents to Betton's house, who was the first agent on Betton's porch, who was the first agent at Betton's door, who opened the screen door, and who failed to knock on the interior door was a direct participant in the allegedly unlawful entry. The evidence indicates that Belue, by opening the screen door, cleared the way for Guess to ram through Betton's interior door before any of the agents knocked, announced and waited a reasonable period of time before entry. Thus, a jury could find that Belue "set[ ] in motion a series of acts by others which [he] [knew] or reasonably should [have known] would cause others to inflict the constitutional injury." *See Sales*, 158 F.3d at 776.[6]

### d. Unlawful Entry and Exigent Circumstances

Under *U.S. v. Saafir*, "a search is unreasonable—and so violates the Fourth Amendment—if its justification is grounded in officers 'engaging or threatening to engage in conduct that violates the Fourth Amendment.'" 754 F.3d 262, 266 (4th Cir. 2014) (quoting *Kentucky v. King,* 563 U.S. 452, 462 (2011)). "Thus, just as an officer may not manufacture exigent circumstances to justify a warrantless search by means that run afoul of the Fourth Amendment . . . an officer may not manufacture probable cause by unlawful means . . . ." *Id.*

---

[6] Since the undersigned has recommended that a reasonable jury could find that Belue's failure to knock and announce was unlawful, the undersigned will not reach the question of Belue's involvement in an alleged conspiracy to execute search warrants without knocking and announcing.

Belue argues that exigent circumstances excuse any of his acts that may have violated Betton's Fourth Amendment rights. ECF No. 149-1 at 11-17. According to Belue, under the particular circumstances as he faced them, he was obligated to enter without first knocking and announcing because Guess and his colleagues had unlawfully entered and as a result faced danger. ECF No. 149-1 at 12.

Betton argues that no exigent circumstances existed that excuse Belue's allegedly unlawful entry because Belue and his colleagues unlawfully created the exigency. ECF No. 163 at 26. He points to Chief Gall's testimony that the officers faced no exigent circumstances. ECF 163 at 13 n. 4; Gall Dep. 90, ECF No. 163-9 at 9. During his 2016 deposition, Belue omitted any mention that he and his colleagues faced exigent circumstances when they arrived at Betton's door. ECF No. 158-5 at 34-36. But in February 2018, he attached an affidavit to his motion for summary judgment in which he stated that there were exigent circumstances that justified his unannounced entry. ECF No. 149-2 at 1-3. In his affidavit, Belue claims that Guess rammed through Betton's door without giving him notice and that two fellow officers immediately followed. He claims that he suspected Betton was armed, was informed he had surveillance cameras, and that he was aware that Betton might have a warrant out for his arrest in another state. Under these circumstances, Belue argues, a reasonable officer would have feared for his life and the lives of the others, thereby making it lawful to enter in the manner he did. *Id.*

When considering the video evidence showing Belue as he went directly from the SUV to Betton's doors without knocking or announcing, the fact that Belue omitted mention of the existence of exigent circumstances in his deposition testimony, and Chief Gall's testimony that there were no exigent circumstances, a reasonable jury could find that there were no exigent

circumstances because the officers unlawfully created the exigency by entering Plaintiff's residence without first knocking and announcing.

### V.    Excessive Force

#### a.  Law

The parties correctly reference *Graham v. Connor*, 490 U.S. 386 (1989), as the test for evaluating the degree of force used during an arrest. There, the Court established that claims against law enforcement for excessive force in the course of an arrest, investigatory stop, or other "seizure" of a person are properly analyzed under the Fourth Amendment's "reasonableness" standard. *Id.* at 395. The Supreme Court recognized "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Further, the Court held that there is not a precise mechanical application of the standard, but "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Additionally, the Court instructs that an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.  Therefore, guided by the authority in *Graham*, the undersigned must examine the totality of the circumstances and the uncontested facts, viewed in the light most favorable to Betton, to determine whether Belue's use of force was reasonable. In taking this view, the undersigned finds that whether excessive force was used remains a question of fact.

The force used by an officer is not excessive if the officer's "actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id.* at 397; *Schultz v. Braga*, 455 F.3d 470, 477 (4th Cir. 2006). "To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Gandy v. Robey*, 520 F. App'x 134, 140 (4th Cir. 2013) (citing *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994)). The United States Supreme Court, the Fourth Circuit, and other circuits have consistently held that officers may use a reasonable amount of force to secure a suspect. *See e.g.*, *Scott v. Harris,* 550 U.S. 372 (2007); *Graham,* 490 U.S. 386; *Thomas v. Holly*, 533 F. App'x 208, 215 (4th Cir. 2013) *cert. denied*, 134 S. Ct. 939 (2014). *Graham* instructs that in analyzing the amount of force used, the court should consider three factors:  (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396. In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed. *Elliott v. Leavitt,* 99 F.3d 640, 644 (4th Cir. 1996). A law enforcement officer has the legal right to use deadly force if the officer has reasonable cause to believe that the suspect poses an immediate threat to the safety of the officer or others, and that deadly force is needed to avoid that threat. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

### b.  The Parties' Arguments

Belue argues that he "did not use actual force until he believed he saw Plaintiff pointing a gun at him and his fellow police officers." ECF No. 149-1 at 24. Belue cites as support *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) for the proposition that "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences." In *Elliott*, police officers pulled over

an individual suspected of drunk driving. *Id.* at 641. During the stop, the police questioned the suspect, patted him down, handcuffed him and placed him in the squad car. *Id.* As the officers were conferring with each other outside the car, they noticed the suspect pointing a gun at them from inside the car. *Id.* at 642. They drew their weapons, ordered the plaintiff to drop the gun, and when he did not they opened fire. *Id.* The suspect suffered injuries and died. *Id.* The court held that the police officers were entitled to qualified immunity because at the time they used deadly force they were aware that the suspect was pointing a gun at them. *Id.* at 643.

Betton points to evidence that he neither pointed nor fired his gun. ECF No. 163 at 28-29 (citing Betton Dep. 115-15, ECF No. 163-6 at 11-12). He testified that as he was coming out of his bathroom and while he was in the hallway that "separates the rooms from the bathroom and the living room . . ." he heard his door being kicked or rammed open. ECF No. 163-6 at 11. He testified that after that he saw "strange shadows moving. I said what the fuck to myself and reached for my gun. And I woke up in the hospital being told I had a shootout with the police." *Id.* He testified that he did not hear police yelling anything and that he heard no verbal commands or even gunshots and that it was totally quiet. ECF No. 163-6 at 12. On this point, Betton also points to the corroborating evidence of his neighbor Santos Garcia, who was standing on the porch as the officers arrived to execute the search warrant. ECF No. 163 at 29. According to Garcia, "[w]ithout stopping, several of the men who had just arrived immediately went up onto Julian's front porch and bashed in his door. None of the men announced that they were police. No one knocked on his door. No one waited any period of time for him to come to the door." ECF No. 163-3 at 1, ¶ 4.

### c.  Analysis

In considering the *Graham* factors, the undersigned finds it only possible to weigh the first of the factors—the severity of the crime. Here, the search warrant was based on the non-violent

offense related to Betton's two separate sales of seven and eight grams of marijuana for $100.00 per sale. DEU Investigative Rpt., ECF. No. 163-21 at 1-3. Therefore, the first factor weighs in Betton's favor. But the undersigned finds that the second and third *Graham* factors cannot be weighed at this point in the litigation. When viewed in a light most favorable to Betton, the facts show that as he left his bathroom and entered the hallway, he heard no announcements or warnings but instead heard a crash through his door, saw moving shadows, and was startled by the commotion. He reached for his gun and held it by his right side, at which point the officers opened fire. Betton Dep. 121, ECF No. 163-6 at 15.

The surveillance footage from Betton's porch does not depict the events that took place inside his apartment and whether Belue was confronted with a suspect who was pointing a firearm at him when he entered. Belue claims Betton was pointing his firearm; Betton claims that he was not. Betton argues his account is supported by the Attorney General's decision to dismiss the pointing and presenting charges against him. ECF No. 163 at 29, n. 6.

The undersigned recommends that whether Betton was pointing and presenting his firearm at the officers as they entered his residence is a question of fact for the jury. Specifically, when viewed in a light most favorable to Betton, there are genuine issues concerning whether Betton posed a deadly threat to Belue and his fellow officers when they entered Betton's apartment (the second *Graham* factor) and as to whether Betton was actively resisting arrest (the third *Graham* factor). *See Graham*, 490 U.S. at 396.

## VI. Qualified Immunity

### a. Law

The Supreme Court in *Harlow v. Fitzgerald* established the standard the court is to follow in determining whether a defendant is protected by this immunity. 457 U.S. 800 (1982). That decision held that government officials performing discretionary functions generally are shielded

from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow,* 457 U.S. at 818. When evaluating a qualified immunity defense, the court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The two prongs of the qualified immunity analysis may be addressed in whatever order is appropriate given the circumstances of the particular case. *Id.* at 236. In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004) (quoting *Saucier v. Katz,* 533 U.S. 194, 200 (2001)). "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." *Id.* (citations and internal quotation omitted).

### b. Qualified Immunity: Unlawful Entry

As the first step of the qualified immunity inquiry, the court must determine whether Belue's conduct violated a constitutional right. *See Gould v. Davis,* 165 F.3d 265, 269. As recommended above, there are genuine issues of fact concerning whether Belue violated Betton's Fourth Amendment rights when he failed to knock and announce.

Under the second step of the qualified immunity test, the court must determine whether Betton's rights were clearly established at the time of the alleged violations. *Id.* The proper inquiry is whether "a reasonable officer could have believed" Belue's actions—failing to knock and announce and using deadly force—"w[ere] lawful, in light of clearly established law and the information [Defendant] possessed at the time." *Carpenter v. Seagroves*, No. 5:14-CV-352-F,

22

2016 WL 3351569, at *8 (E.D.N.C. June 13, 2016) (citing *Orem v. Rephann*, 523 F.3d 442, 488-49 (4th Cir. 2008)). In a qualified immunity analysis, the court is not supposed to recognize a constitutional right in the abstract "but at the level of its application to the specific conduct being challenged." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). In *Saucier*, the Supreme Court explained that whether a right is clearly established should be "undertaken in light of the specific context of the case, not as a broad general proposition." 533 U.S. at 201; *see Graham v. Gagnon*, 831 F.3d 176, 182 (4th Cir. 2016) ("The right at issue here is not the general right to be free from arrest without probable cause, but rather the right to be free from arrest under the particular circumstances of the case."). The undersigned will consider the second step of the qualified immunity test in turn for each of the alleged Fourth Amendment violations.

### i. The Parties' Arguments

Belue argues that he is entitled to qualified immunity because it was not clearly established that opening the screen door was a violation of Betton's rights. ECF No. 149-1 at 8. Belue also argues that exigent circumstances entitle him to qualified immunity for his entry into Betton's apartment. ECF No. 149-1 at 12-13. According to Belue, a reasonable officer would have believed that entering the apartment was lawful because his fellow agents entered, and he was committed to following them in. *Id.* at 12. He cites in support Betton's expert Drago who testified that "[a]t that point, the team's lack of preparation would have committed him." *Id.* at 13. In addition, he argues that the law was not clearly established that he could not enter Betton's apartment. *Id.* at 14.

Betton argues that the knock and announce requirement was clearly established at the time of Belue's entry. ECF No. 163 at 24. According to Betton, Belue's arguments ignore his direct participation in the unlawful entry. He argues that Belue ignored his acts that led to the unlawful

entry and that "knowingly facilitated" Guess's unlawful entry because he held the screen door open according to the plan outlined in the pre-raid briefing. *Id.* Betton also argues that whether the law was clearly established does not turn on the presence of screen doors. *Id.* at 25. According to Betton, the absence of a case related to screen doors does not mean that the law was not clearly established that when executing a search warrant, officers must knock and announce before entering. *Id.* Finally, Betton argues that Belue ignores his direct participation in creating the exigency and that the nature of his participation forecloses any ability on his part to use exigent circumstances to justify his entry without first knocking, announcing and waiting a reasonable period of time before entering. *Id.* at 26-27.

### ii.  Qualified Immunity: Unlawful Entry Analysis

In determining whether Belue should be afforded qualified immunity for unlawful entry, the court must determine whether a reasonable officer armed with the information Belue possessed at the time of the search warrant's execution would have believed that his actions were lawful. *See Graham*, 831 F.3d at 184 (internal citations omitted) ("In determining what conduct of Graham's was known to the officers, we consider only 'information actually possessed by the officer[s] at the critical time, or that was then reasonably available to [them], and in light of any exigencies of time and circumstance that reasonably may have affected the officer[s'] perceptions.'"). Additionally, though the test "focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland v. Perry*, 41 F.3d at 173. The *Rowland* court held: "[s]uch a perspective serves two purposes: First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the police officer reasonably perceived." *Id.* (internal citations omitted).

Here, Belue knew that he and the DEU team were going to execute a standard search warrant at a private residence. Belue Dep. 54-55, ECF No. 163-5 at 19-20. When he was the first on Betton's porch and the first at Betton's doors, he knew that the law required that he knock, announce and wait a reasonable time before entering. Again, Belue testified that "you're at the door, so you knock on it." Belue Dep. 75, ECF No. 163-5 at 24. Here, Belue was not making the kind of "bad guess[ ] in a gray area" that would entitle him to qualified immunity. *See Bellotte v. Edwards,* 629 F.3d 415, 424 (2011). Instead, he was crossing a line of which he admits he was aware. *See Id.* at 428 (Wynn, J., dissenting). At bottom, he failed to knock, and he failed to announce. Accordingly, the undersigned recommends that Belue is not entitled to qualified immunity on the unlawful entry claim because Betton has alleged a constitutional violation of rights that were clearly established at the time of their violation.

### c.  Qualified Immunity Excessive Force
#### i.  The Parties' Arguments

Belue argues that his belief that Betton was pointing his gun when Belue used deadly force entitles him to qualified immunity. ECF No. 149-1 at 18-19. Belue relies on *Elliott*, 99 F.3d at 644, in support of his argument. As discussed above, the court in *Elliott* found that the officers were justified in using deadly force because the court found that the plaintiff was pointing a gun at them. *Elliott, Id.* at 643.

Under the first prong of the qualified immunity test, the undersigned recommended above, *supra* at section IV.c., that Betton has alleged a constitutional violation of his Fourth Amendment right to be free from an unreasonable seizure by virtue of the unlawful use of deadly force. The question under the second prong is whether the right was clearly established that a person is entitled to be free from excessive force when, after officers use a battering ram to enter his home without knocking and announcing, the person reaches for his gun as a result of the startling disturbance but

is not pointing the gun at the officers as they enter. Betton points to two Fourth Circuit cases that are instructive.

The first is *Cooper v. Sheehan,* 735 F.3d 153, 160 (4th Cir. 2013). In *Cooper*, police answered a call concerning a disturbance and went to the suspect's home. *Id.* at 155. They approached the suspect's home, tapped on his window, and when there was no answer they went to back of the house to further investigate. *Id.* As they were proceeding to the rear of the house, the suspect came out of the backdoor with his rifle in his hand and called out to see who was there. *Id.* The officers did not respond, but when they encountered the suspect with his rifle, they opened fire without warning and without ordering him to drop his weapon. *Id.* at 155-56. The Fourth Circuit held that "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force" and that a jury could conclude that the officers' use of force was unreasonable and excessive. *Id.* at 159. The court reasoned that "an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Id.*

Betton next relies on *Hensley v. Price,* 876 F.3d 573 (4th Cir. 2017). In *Hensley*, the officers arrived at the suspect's home after answering a call related to a domestic disturbance. *Id.* at 578. After their arrival, and while still inside their squad car, the officers observed the suspect emerge from his home and onto his porch where he had an altercation with his daughters, one of whom he struck with his gun. *Id.* The officers then observed the plaintiff step off his porch and walk toward the officers with his gun still in hand and pointed toward the ground. *Id.* Having "never ordered him to stop, drop the gun or issue[ ] any type of warning[,]" the officers opened fire. *Id.* The Fourth Circuit held that the evidence supported the plaintiff's claim for excessive force and the officers were not entitled to qualified immunity because the plaintiff "never raised the gun, never threatened the Deputies, and never received a warning command . . . ." *Id.* at 586.

26

### ii.  Qualified Immunity: Excessive Force Analysis

The undersigned finds that *Elliott,* upon which Belue relies, is distinguishable from the facts of the present case. Again, in *Elliott*, the plaintiff was pointing a gun at the police officers. *Elliott,* 99 F.3d at 642. The officers also drew their guns and then gave verbal warnings to the plaintiff to drop the gun. *Id.* The officers opened fire only after the plaintiff's failure to comply with their commands. *Id.* In the present case, there is a genuine dispute whether Betton was pointing his gun at the officers when Belue opened fire.

Thus, under *Cooper* and *Hensley*, the right was clearly established that an individual is entitled to be free from the use of excessive force if the person is on his property or in his residence, is in possession of a gun that he is not pointing at police officers, and is not given a warning or command to drop the gun before he is shot. *See Cooper,* 735 F.3d at 160; *see also Hensley,* 876 F.3d at 582-83. The undersigned therefore recommends that Belue is not entitled to qualified immunity from Betton's claim for excessive force.

### d.  Qualified Immunity: Tactical Excessive Force

In his twelfth claim for relief, Plaintiff alleges that "[d]efendants Guess, Waddell, Dennis, Belue, Bishop, and Knowles intentionally elected to use SWAT-like tactics and forcible, dynamic entry when executing the search warrant as a raid on Betton's home." Am. Compl., ECF No. 102 at 38-40, ¶ 245. Betton also alleges that "[t]he SWAT-like raid was unreasonable and constituted excessive force under the Fourth and Fourteenth Amendments." *Id.* at 38, ¶ 246.

Belue argues that Betton's tactical excessive force claim fails because an excessive force claim must be analyzed at the moment force was used, and pre-raid planning cannot be taken into account. *See Elliott,* 99 F.3d at 644. Betton argues that his "claim is not based solely on pre-raid tactics, but on the totality of the circumstances, including the knock-and-announce violation. Pre-raid conduct is plainly relevant to evaluating whether a raid was reasonable under the Fourth

Amendment and whether officers intentionally agreed to commit that violation." ECF No. 163 at 27, n. 7.

Again, step two in the qualified immunity analysis asks if the right was clearly established at the time of the alleged violation. Because "[c]ourts can exercise their sound discretion when deciding which of the two steps to address first," the undersigned will proceed at step two. *Selepack v. Newsome,* 1:15-cv-01227 (JCC/JFA) 2016 WL 335679, at *8 (E.D. Va. Jan. 27, 2016) (quoting *Pearson v. Callahan*, 553 U.S. at 236). The constitutional right raised here is Betton's right to be free from an unlawful entry that resulted from the decision to use tactical force or SWAT-like tactics. Because Belue did not make the decision to employ SWAT-like tactics to enter, the right was not clearly established that Betton could be free from the use of SWAT-like force from an officer such as Belue who was not in command of the DEU or of its operational plan.

The undersigned recommends that, to the extent Betton's twelfth claim is also one for excessive force, Belue's motion for summary judgment be granted because an excessive force claim must be examined at the moment force is applied, and the SWAT-like tactics were the result of planning prior to that moment. *See Elliott,* 99 F.3d at 642 ("The court's focus should be on the circumstances at the moment force was used . . . .").

### VII.    State Law Claims

Betton also brought claims against Belue for assault and battery and trespass. The South Carolina Tort Claims Act ("SCTCA") grants to the State, its political subdivisions, and employees, while acting within the scope of official duty, immunity from liability for any tort, except as waived therein. S.C. Code Ann. § 15-78-20(b). Section 15-78-70(a) provides that "[t]his chapter constitutes the exclusive remedy for any tort committed by an employee of a governmental entity. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided for in subsection (b)." However, an

employee does not have immunity from suit "if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-70(b).

"[I]f the plaintiff proves that 'the employee's conduct . . . constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude,' then the governmental agency is not liable, and the employee is personally liable." *Roberts v. City of Forest Acres*, 902 F. Supp. 662, 671 (D.S.C. 1995) (quoting S.C. Code § 15-78-70(b)). "[T]he SCTCA is not intended to protect state employees from liability for intentional torts." *Anthony v. Ward*, 336 F. App'x 311, 317 (4th Cir. 2009) (unpublished).

Under South Carolina law, "an assault occurs when a person has been placed in reasonable fear of bodily harm by the conduct of the defendant, and a battery is the actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree." *Jones by Robinson v. Winn-Dixie Greenville, Inc.,* 318 S.C. 171, 175, 456 S.E.2d 429, 432 (S.C. Ct. App. 1995). "[I]f the officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable for assault or battery." *McCoy v. City of Columbia,* 929 F. Supp. 2d 541, 567 (D.S.C. 2013).

"'Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property.'" *Coll. of Charleston Found. v. Ham*, 585 F. Supp. 2d 737, 750 (D.S.C. 2008) (quoting *Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 357, 559 S.E.2d 327, 337 (S.C. Ct. App. 2001). "The essence of trespass is the unauthorized entry onto the land of another." *Ravan v. Greenville Cty.*, 315 S.C. 447, 464, 434 S.E.2d 296, 306 (S.C. Ct. App. 1993).

Because the undersigned has determined that questions of fact remain concerning Belue's alleged unlawful entry and his alleged use of excessive force, whether Defendant is entitled to

statutory immunity also remains a genuine issue of material fact on the trespass and assault and battery allegations. Accordingly, the undersigned recommends denying Belue's motion for summary judgment on Betton's claims under state law.

### VIII.  Municipal Liability under § 1983

#### a.  Law

The U.S. Supreme Court in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), held that municipalities can be liable only for their own illegal acts. Specifically, "§ 1983 liability may attach to a municipality for the misconduct of its police force." *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 210 (4th Cir. 2002). Under *Monell*, municipal liability can result "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." 436 U.S. at 694.

In *Spell v. McDaniel*, the Fourth Circuit explains the principles set out in *Monell*. 824 F.2d 1380, 1385-93 (1987). The Fourth Circuit explains that the "policy" at issue in a *Monell* claim can be a municipal ordinance, regulation, or formal or informal policies that authorize constitutional violations. *Id.* at 1385-86. The court described "custom or usage" as "persistent and widespread . . . practices of state officials [which] [a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law." *Id.* at 1386 (citing *Monell*, 436 U.S. at 691). Furthermore, the court explained that a municipality is liable for a constitutional violation when the policy or custom is "(1) fairly attributable to the municipality as its 'own,' and is (2) the 'moving force' behind the particular constitutional violation." *Id.* at 1387. The court also explained that custom and usage "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Id.* at 1387.

Finally, there must be proximate cause or an "affirmative link" between the policy and the constitutional violation. *Id.* at 1388. The *Spell* court found: "Neither the existence of such a policy or custom nor the necessary casual connection can be established by proof alone of the single violation charged." *Id.*

Furthermore, a municipality is liable for constitutional violations caused by a "custom or policy" attributable to an entity or individual vested with the municipality's final policymaking authority. *Spell,* 824 F.2d at 1386-87. "A municipal agency or official may have final policymaking authority by direct delegation from the municipal lawmaking body." *Id.* at 1387. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority and of course, whether an official had final policymaking authority is a question of state law." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986). Delegation may also be "implied from a continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an agency or official.*" Spell,* 824 F.2d at 1387.

"[P]olicymakers . . . decide goals for a particular city function and devise the means for achieving those goals." *Id.* at 1386 (quoting *Bennett v. Slidell,* 728 F.2d 762, 769 (5th Cir. 1964)). "'[P]olicymaking authority' implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." *Id.* at 1386 (citing *Pembaur,* 475 U.S. at 481-82). A determination of who may have final policymaking authority for the unconstitutional action alleged to have occurred requires a review of "the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law . . . ." *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 737 (1989).

### b. Whether Myrtle Beach Delegated its Authority

### i. The Parties' Arguments

The City makes a number of arguments related to Betton's municipal liability claims. First, the City argues that its policies and practices were consistent with the Fourth Amendment and that Betton has failed to allege a city policy, custom or practice that caused him injury. The City further argues that any flawed policies, customs or practices of the DEU cannot be attributed to the City.

The City next argues that Betton "does not allege the policymakers for the City were deliberately indifferent to a pattern of DEU widespread unconstitutional practices that [were] known to those policymakers. Plaintiff only alleges the City's police officers were routinely exposed to patterns and practices of the DEU through their association with DEU." ECF No. 142-12 at 8.

The City next asserts that it cannot be liable on a theory of actual or constructive notice for practices of which only lower level officers, not policymakers, knew. The City also asserts that it did not delegate its policymaking authority to the DEU, and it therefore cannot be held liable for Fourth Amendment violations allegedly committed by the DEU. *Id.* at 11. In support, it notes that of its 270 police officers, only 7 were assigned to the DEU. City of M.B. Reply Br., ECF No. 162 at 4. The city continues:

> The 7 officers assigned to DEU had performed those functions for [the City]. Those 7 officers were under the [City's] street crimes division and supervised by [the City] police officer Tony Mitchell. While [the City] in one sense may have dissolved its narcotics unit, [the City] did not dissolve its street crimes division and those 7 officers continued to be supervised by Officer Mitchell during the Betton incident. [The City] did not delegate to DEU policymaking authority for enforcement of narcotics laws. Every [City] sworn police officer was responsible for the enforcement of narcotics laws under [the City's] policies. Further, [the City] did not delegate policymaking authority to DEU for executing search warrants. Every sworn police officer had the responsibility for executing search warrants under [the City's] policies. [The City] has its own

> policies for law enforcement and its own policies on execution of
> search warrants. [The City's] policies did not proximately cause any
> injuries to Betton. [The City] is not liable to Betton for another
> entity's alleged practices or policies.

*Id.* at 4-5. The City also argues that the DEU is a creation of state statute under S.C. Code Ann. §
21-1-210 and was not created pursuant to any municipal authority. ECF No. 142-12 at 11-12.
Finally, the City argues that Betton's theory of delegation masks an erroneous attempt to advance
a *respondeat superior* theory of liability that is forbidden under section 1983. *Id.* at 13.

In response, Betton argues that the City is liable for the DEU's failures because, by virtue
of agreement, it delegated its drug enforcement operations and policymaking authority to the DEU.
ECF No. 158 at 18-21. According to Betton, the City is thus liable for the DEU's widespread
practice of violating the Fourth Amendment's knock and announce requirements. ECF No. 158 at
21-26. Betton further argues that the fact that the DEU ignored the knock and announce
requirement is a result of the City's deliberate indifference to the DEU's deficient policies and
procedures.

### ii.  Analysis

Under S.C. Code Ann. § 5-7-160 "[a]ll powers of the municipality are vested in the council,
except as otherwise provided by law, and the council shall provide for the exercise thereof and for
the performance of all duties and obligations imposed on the municipality by law." *See also* S.C.
Code Ann. § 5-7-110. By virtue of this statute, the undersigned recommends a finding that the
City, and its governing council, had final policymaking authority over the Myrtle Beach Police
Department and its provision of law enforcement services within the City. State statute also directs
that -

> [a]ny municipality may appoint or elect as many police officers,
> regular or special, as may be necessary for the proper law

enforcement in such municipality and fix their salaries and prescribe their duties.

Police officers shall be vested with all the powers and duties conferred by law upon constables, in addition to the special duties imposed upon them by the municipality.

Any such police officers shall exercise their powers on all private and public property within the corporate limits of the municipality and on all property owned or controlled by the municipality wheresoever situated; provided, that the municipality may contract with any public utility, agency or with any private business to provide police protection beyond the corporate limits.

S.C. Code Ann. § 5-7-110.

Under S.C. Code Ann. § 23-1-210, repealed and replaced on June 3, 2016, by the "Law Enforcement Assistance and Support Act," "[a]ny county, incorporated municipality, or other political subdivision of this State may enter into mutual aid agreements as may be necessary for the proper and prudent exercise of public safety functions. All agreements must adhere to the requirements contained in Section 23-20-40." S.C. Code Ann. § 23-20-30.

Exercising its final policymaking authority, the City entered into an agreement with the DEU under which the City assigned its police chief to the DEU Governing Board, and by doing so the undersigned recommends a finding that the City delegated its "authority to make municipal policy" to the DEU's governing board. The Governing Board, with Chief Gall as a member and representative of the City, possessed the authority to "set policy, approve the budget, and provide for the general direction for DEU operations." ECF No. 158-20 at 2. The Governing Board and Chief Gall exercised their authority over the execution of the DEU's stated mission "to identify, investigate, and prosecute individuals who participate in illegal drug manufacturing cultivation, distribution and/or trafficking within the 15th Judicial Circuit, Horry/Georgetown Counties. Specifically, DEU intends to combine the intelligence and investigative powers of the above

referenced law enforcement agencies in an effort to enhance and streamline the drug investigations in Horry and Georgetown Counties." ECF No. 158-20 at 1.

Thus, in addition to the Myrtle Beach City Council, the undersigned recommends a finding that Chief Gall had final policymaking authority for the City because he is responsible for ". . . . decid[ing] goals for a particular city function and devis[ing] the means for achieving those goals." *See Spell*, 824 F.2d at 1386. State statute also provides similar evidence of Chief Gall's final policymaking authority:

> Provided the conditions and terms of the mutual aid agreements are followed, the chief executive officers of the law enforcement agencies in the concerned counties, incorporated municipalities, or other political subdivisions have the authority to send and receive such resources, including personnel, as may be needed to maintain the public peace and welfare.

S.C. Code Ann. § 23-20-40 (D).

According to the "Myrtle Beach Police Department Administrative Regulations & Operating Procedures" manual, "[t]he department Chain of Command is from the Chief of Police to Captain and on down through the ranks." ECF No. 158-39 at 12. The manual also states that

> "[t]he Chief of Police oversees the accomplishment of departmental goals and objectives through supervision, planning, directing and organizing all division [sic] of the department. All personnel, budget and policy matters are handled through the Administration Division along with the day-to-day operation of the department. The Administration Division Captain supervises the Training Unit, Regulatory Unit, Crime Prevention, Animal Control, and the Office of Professional Standards as well as other administrative matters directed by the Chief of Police."

ECF No. 158-39 at 10; *see also Curry v. Town of Atl. Beach*, No. 4:15-cv-3327, BHH-TER, 2017 WL 627401, at *10 (D.S.C. Jan 31, 2017) ("it appears that Chief Lewis possessed final policy making authority").

When asked in his deposition testimony "[w]hat role does the Governing Board of DEU have in setting polices [sic] and procedures?" Chief Gall replied, "I think our position is to—as an administrative oversight and some operational oversight and to approve the policies and procedures." ECF No. 158-9 at 9, ll. 14-19. Based on the above, the undersigned recommends a finding that the City and Chief Gall "have final policy making authority" over the DEU "by direct delegation from the municipal lawmaking body" under the agreement with DEU and by virtue of Chief Gall's appointment to DEU's Governing Board. *See Spell*, 824 F.2d at 1386-87.

### c. Whether the Failure to Knock and Announce amounts to a DEU Custom or Practice for which The City is Liable

#### i. Law

"'Official policy' in the relatively narrow sense of discrete, consciously chosen courses of action by 'policymakers' is not the only basis for imposing municipal liability." *Id.* at 1386. "'Custom, or usage,' in the exact language of § 1983, may also serve." *Id.* (citing *Monell*, 436 U.S. at 690-91). "[T]he existence of such a 'custom or usage' may be found in 'persistent and widespread practices of municipal officials which although not authorized by written law, are so permanent and well-settled as to have the force of law." *Id.* (quoting *Monell*, 436 U.S. at 691) (alterations and quotation marks omitted).

"[A] city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014) (quoting *Spell*, 824 F.2d at 1389). A city is also liable if it fails to stop a "policy or custom that is not itself unconstitutional" but is the proximate cause of a constitutional violation. *Spell*, 824 F.2d at 1387-88. "[W]here a municipal policymaker has actual or constructive knowledge of such a course of customary practices among employees subject to

the policymaker's delegated responsibility for oversight and supervision, the 'custom or usage' may fairly be attributed to the municipality as its own." *Id.* at 1387. But "[n]ot every decision by every municipal official will subject a municipality to section 1983 liability." *Riddick v. Sch. Bd. of Portsmouth,* 238 F.3d 518, 523 (4th Cir. 2000) (quoting *Pembaur*, 475 U.S. at 481). Policy is not created by "episodic exercises of discretion in the operational details of government." *Spell*, 824 F.2d at 1386.

### ii.  Analysis

On the issue of what is required to establish a "widespread practice," *Kopf v. Wing,* 942 F.2d 265 (4th Cir. 1991) is instructive. In *Kopf*, the plaintiff, suspected of having committed an armed robbery, was apprehended during the course of a chase by police officers and suffered serious injuries as a result of being struck when the officers used a blackjack and a flashlight. *Id.* at 267. The plaintiff also suffered injuries after a police dog attacked him. *Id.* at 265-67. The plaintiff sued the officers and county under section 1983 alleging excessive force in violation of the Fourth Amendment. *Id.* at 265, 269. The plaintiff "argue[d] that Prince George's County has failed to maintain adequate internal checks on excessive use of force and has thereby allowed it to become a pattern." *Id.* at 269. The officers and county filed a motion for summary judgment, and the district court granted their motion. *Id.* at 267.

The plaintiff appealed, and the Fourth Circuit reversed. *Id.* at 267, 270. The court held that appellant's claim against the county for "an unconstitutional custom or practice" was sufficient to survive summary judgment because "appellant cites numerous particular incidents of excessive force . . . ." *Id.* at 269. The court continued: "if [he] can prove the *numerous* instances of excessive force [he] alleges, in conjunction with the circumstantial evidence of a 'circle the tents' approach

to police brutality complaints, we think a fair-minded jury could find that the county has a custom or practice of letting incidents of excessive force go unpunished." *Id.* (emphasis added).

The "custom" at issue in the present case concerns the DEU's alleged practice of executing standard search warrants without first knocking and announcing and waiting a reasonable period of time before entering a private residence. In his affidavit, David McIntyre, a participant in the Betton raid and a former member of the Myrtle Beach Police Department and of the DEU, stated that he "participated in approximately 30 residential search warrant executions during the six months [he] served in DEU, including the execution of a residential search warrant at the apartment of Julian Betton at 602 Withers Swash Drive on April 16, 2015." ECF No. 158-4 at 1, ¶ 5. McIntyre adds that "[i]n my experience supporting DEU residential search warrant operations from approximately October 2014 through April 2015, DEU agents almost always forcibly entered without knocking and announcing, or simultaneously with announcing. For those operations within the City of Myrtle Beach, MBPD uniform officers typically provided support." *Id.* at 2, ¶ 11. McIntyre's testimony supports an inference that the DEU executed search warrants without knocking and announcing at least five times per month on average or, viewed differently, at least once a week on average during his six months of DEU service.

Consistent with McIntyre's testimony is the deposition testimony of Agents Belue and Waddell. When Belue was asked, "[i]s up to that point in time . . . there was nothing unusual about the way that that warrant was being executed . . . for a knock and announce warrant?" Belue answered "[t]hat's correct." Belue Dep. 92, ECF No. 158-5 at 15. Waddell was asked a similar question: "April 16, 2015, up to the moment that that door is breached, was there anything about that operation up to that point that deviated in any significant way with DEU practices?" Waddell answered, "I don't feel as though there was any abnormality or deviation that—that, you know, I

recognized or identified leading up to the operation." Waddell Dep. 217, ECF No. 158-13 at 18. The undersigned also recommends a finding that the numerous instances of failing to knock and announce, combined with the false statements made to SLED, and the DEU's failure to take corrective action, as discussed in the next section, reveal a "circle the tents" approach similar to the one discussed in *Kopf,* 942 F.2d at 269.

The undersigned recommends a finding that based on this testimony, which supports an inference of numerous alleged violations of the knock and announce requirement, the DEU had a widespread and persistent policy of executing search warrants without knocking and announcing and waiting a reasonable time before entering a private residence.

### d.  Whether the City Knew of the Practice and Whether it Demonstrated Deliberate Indifference

#### i.  Law

Municipal liability based on a practice can be demonstrated by "a 'persistent and widespread practice of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386-91). "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Id.* at 402-03 (quoting *Spell*, 824 F.2d at 1391). "[W]idespread or flagrant" violations suffice to make these inferences. *Id.* at 403 (quoting *Spell*, 824 F.2d at 1387); *see also Spell*, 824 F.2d at 1387 (explaining that municipal policymakers properly exercising their official responsibilities should know of widespread practices).

#### ii.  Analysis

The undersigned recommends a finding that a reasonable jury could find that both the City and Chief Gall had actual or constructive knowledge of the alleged widespread practice or custom of executing standard search warrants without first knocking and announcing by virtue of the extent of the misconduct highlighted by the numerous instances that Betton points to in the record and by virtue of the fact that Belue and Waddell testified that the manner in which the warrant was executed on the date in question was consistent with the DEU's standard practice.

In addition, "[t]he absence of a written policy in the face of a known risk of harm can be evidence of a policy of deliberate indifference to a person's constitutional rights . . . ." *See Marmelshtein v. City of Southfield*, No. 07-15063, 2013 WL 511239, at *4 (E.D. Mich. Feb. 12, 2013). Betton points to documentary evidence justifying an inference of deliberate indifference. For example, the "Searches and Seizures" section of the DEU's SOP omits any requirement that officers knock, announce and wait a reasonable time. By contrast, the "Search and Seizure" section of the Myrtle Beach Police Department's "Administrative Regulations and Operating Procedures" includes a knock and announce requirement. ECF No. 158-19 at 13. According to the MBPD policy, "[u]nless a judicial official has issued a No Knock Warrant or exigent circumstances exist, officers shall knock and give notice of their intent to execute a search warrant before attempting forcible entry. Officers shall wait a reasonable time before making forcible entry." *Id.* In a July 15, 2015, email exchange between Chief Gall and Commander Knowles, Chief Gall states, "[c]an you send me a copy of the DEU Search Warrant Execution Policy. I can find a procedure on Search and Seizure, but it does not include Search Warrants and the execution thereof. I am in the process of reviewing the SLED report on the shooting investigation and I need this information . . . Thanks." ECF No. 158-25 at 1. Commander Knowles responded, "I will . . . forward the most recent copy of our SOP's but I do not believe we have any policy on search warrant execution."

*Id.* And Chief Gall replied, "Thanks…… it appears that the search & seizure policy follows our policy verbatim, until it reaches the search warrant section…then DEU's policy has nothing. I thought maybe I missed something or it was not copied to my file. If it's absent, it's certainly a concern . . . ." *Id.*

Further evidence of deliberate indifference is found in the DEU's failure to reprimand the officers for their violations. "As subsequent conduct may prove discriminatory motive in a prior employment decision, and subsequent acts may tend to prove the nature of a prior conspiracy, so the subsequent acceptance of dangerous recklessness by [a] policymaker tends to prove his preexisting disposition and policy." *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that a municipal defendant's failure to fire or reprimand officers following an egregious incident of excessive force evinced a deliberate indifference to their misconduct); *see also Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) (finding that the failure to correct unconstitutional practices after the initiation of litigation was evidence of its deliberate indifference).

Here, immediately after the incident, SLED began an investigation into whether the officers involved in the Betton raid violated the law. ECF No. 158-11 at 29. As discussed above, within hours of the shooting, SLED agents interviewed and took a written statement from Santos Garcia, the individual who was standing on the steps of the house as the officers arrived on the scene. ECF No. 158-3 at 1. The next day, Agents Bishop, Guess, Belue, Dennis and Waddell provided statements to SLED. ECF No. 158-5 at 37. All of the agents, including Belue, stated that they knocked, announced and reasonably waited at Betton's door before forcibly entering. ECF No. 158-16 at 1-5; ECF No. 158-18 at 1-6; ECF No. 158-23 at 1-3; ECF No. 158-24 at 1-3; ECF No. 158-3 at 1-3.

41

Video footage from Betton's front porch revealed that these statements were false and that there had been no knock and announce. ECF No. 158-15 at 1; ECF No. 158-33 at 1; ECF No. 158-9 at 30-31; ECF No. 158-5 at 42. Agents Belue, Dennis, and Waddell also told SLED that Betton shot his weapon at them first and in response they returned fire. ECF No. 158-23 at 1-3; ECF No. 158-24 at 1-3; ECF No. 158-3 at 1-3. The SLED investigation and firearms analysis revealed that Betton did not fire his gun. ECF No. 159-35 at 5-6.

The DEU did not conduct an internal review of its agents' conduct during the course of the execution of the search warrants. Knowles Dep. 51-52, ECF No. 158-11 at 16-17. Nor did DEU discipline Bishop, Guess, Belue, Dennis, or Waddell. *Id.* During his deposition testimony, Knowles was asked why the agents were not disciplined for their conduct or for their false statements. *Id.* Knowles answered, "[t]hey didn't do anything wrong." *Id.*

During his deposition on January 6, 2017, Chief Gall was asked about his review of the events that took place during and after the incident. Gall Dep. 94, ECF 158-9 at 32. He was asked:

> Q: Over on Paragraph 5 under the concerns it says, [t]he pre-raid briefing needed to address the issue of the search warrant, knock-and-announce or no-knock, and make sure that it is clearly understood. Additional training and supervision is needed to ensure compliance with search warrant protocol and a clear understanding of Fourth Amendment issues . . . In you—to your knowledge has any of that additional training occurred up to this point?
>
> A: To my knowledge, no.
>
> Q: Any idea why?
>
> A: I've had—I mean, I've had the conversation with Commander Knowles, but I can't tell you—he has not expressed back to me that A, B, or C has been completed.

*Id.* ll. 3-19.

On these facts, a reasonable jury could conclude that the City's failure to address and correct the alleged deficiencies in DEU search warrant policies and practices exhibited deliberate indifference.

### e. Whether the Practice or Custom was the Moving Force Behind the Alleged Constitutional Violation

#### i. Law

A municipal policy or custom must also be "the 'moving force' behind the particular constitutional violation." *Spell,* 824 F.2d at 1386-87 *(*quoting *Polk County v. Dodson,* 454 U.S. 312, 326 (1981)). "When a municipal 'policy or custom' is itself unconstitutional, i.e., when it directly commands or authorizes constitutional violations, the causal connection between policy and violation is manifest and does not require independent proof." *Id.* at 1387 (citation omitted). For a practice not itself unconstitutional, a "sufficiently close causal link between such a known but uncorrected custom or usage and a specific [constitutional] violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Id.* at 1391. "[F]ailure to correct the known practices must be such as to make the specific violation 'almost bound to happen, sooner or later . . . .'" *Id.*

#### ii. Analysis

Here, as discussed above, the City entered into an agreement with the DEU and thereby ratified the DEU's standard operating procedures. Chief Gall sat on the DEU's Governing Board and had the authority to create and oversee DEU policy. The DEU failed to include in its manual a discussion of the Fourth Amendment's requirement that law enforcement officers must knock, announce and wait a reasonable time when executing standard search warrants.

In light of this constitutional omission, a reasonable jury may not find it surprising that Belue testified that he did not know how long he should wait before entering a residence and that the DEU had not trained him on this question. Moreover, Agent Dennis stated that he understood that the time one must reasonably wait is included in the time before knocking and announcing— not after. And Agent Guess testified that "[i]t's not the law to knock and announce. You know, it's just not." Guess Dep. 156, ECF No. 158-10 at 18.

Given the manual's constitutional omission, the agents' deficient understanding, the numerous instances giving rise to the inference that the DEU entered homes without knocking and announcing, and the absence of any corrective action, a reasonable jury could find that the alleged unannounced entry into Betton's apartment was "bound to happen, sooner or later." *Spell*, 824 F.2d at 1391.

### IX.     Conclusion

Based on the foregoing, it is recommended that Defendant Belue's Motion for Summary Judgment, ECF No. 149, be *granted* in part and *denied* in part. Specifically, the undersigned recommends *granting* Defendant Belue summary judgment on Plaintiff's § 1983 claim for Fourth and Fourteenth Amendment tactical excessive force violations. However, based on disputed facts, the undersigned recommends *denying* Defendant Belue's summary judgment motion on Plaintiff's Fourth Amendment causes of action for unlawful entry and excessive force, and on Plaintiff's causes of action under state law for assault, battery, and trespass.

It is also recommended that Defendant City of Myrtle Beach's Motion for Summary Judgment, ECF No. 142, on Plaintiff's claim for municipal liability under § 1983 be *denied*.

IT IS SO RECOMMENDED.

May 21, 2018                                Kaymani D. West
Florence, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation.**