IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION
FILE NO.: 4:15-cv-04638-AMQ-KDW

| | |
|---|---|
| JULIAN RAY BETTON,             ) | |
|           ) | |
|      *Plaintiff*,      ) | |
|    v.          ) | |
|         ) | |
| BILL KNOWLES in his individual capacity and  ) | |
| official capacity as Commander of the 15th Circuit ) | **PLAINTIFF'S RESPONSE TO** |
| Drug Enforcement Unit Task Force; JIMMY  ) | **DEFENDANT BELUE'S** |
| RICHARDSON II in his individual capacity and  ) | **OBJECTIONS TO REPORT AND** |
| official capacity as 15th Circuit Solicitor; DEAN ) | **RECOMMENDAITON** |
| BISHOP in his individual capacity; CHAD  ) | |
| GUESS in his individual capacity; FRANK  ) | |
| WADDELL in his individual capacity; CHRIS  ) | |
| DENNIS in his individual capacity; DAVID  ) | |
| BELUE in his individual capacity; and CITY OF ) | |
| MYRTLE BEACH,      ) | |
|         ) | |
|     *Defendants*.    ) | |

## INTRODUCTION

On April 16, 2015, ten agents of the 15th Circuit Drug Enforcement Unit ("DEU")

bearing a standard knock-and-announce search warrant converged on the Myrtle Beach residence

of plaintiff Julian Betton.  Defendant David BeLue was the first officer to Betton's front door.

BeLue did not knock on the screen door, knock on the interior door, or announce himself as an

officer.  Neither did the other DEU agents.  Instead, BeLue held open the screen door so agent

Chad Guess could smash the interior door with a battering ram, and BeLue and two other agents

rushed into Betton's home with their semi-automatic rifles raised.

Betton was walking out of his bathroom when he heard his front door broken in.  He did

not know the armed men who broke in were police.  They never identified themselves or gave

any commands.  Startled by the break-in, Betton reached for a gun in his back waistband.  He did

1

not raise or point it at anyone.  Within two or three seconds of breaking in, BeLue and the other

agents fired 29 shots at Betton, hitting him nine times and paralyzing him for life.

BeLue violated the Constitution and South Carolina law when he (1) entered Betton's

home without knocking, announcing his presence, and waiting a reasonable period of time; and

(2) shot Betton even though Betton did not raise his weapon, did not know the armed men were

officers, and was not given any commands.  BeLue is liable for Betton's injuries.  As Magistrate

Judge Kaymani D. West correctly concluded in her Report and Recommendation, (Dkt. No.

173), BeLue's motion for summary judgment should be denied.

## STATEMENT OF THE FACTS

**I.      BeLue Joins the Myrtle Beach Police Department and the Drug Enforcement Unit.**

In 2007, defendant David BeLue began his law enforcement career as a uniform patrol

officer with the Myrtle Beach Police Department ("MBPD").  (Dkt. No. 163-5 ("BeLue Dep.")

pp. 10, 17.)  In 2010, BeLue requested assignment to the 15th Circuit Drug Enforcement Unit

("DEU"), and MBPD granted the request.  (BeLue Dep. pp. 18, 20, 26, 29.)  The formation,

organization, and operations of the DEU are discussed in Plaintiff's Response to Myrtle Beach's

Objections to the Report and Recommendation, filed contemporaneously with this response.

DEU agents typically executed multiple residential search warrants per month.  (Dkt. No.

163-11 ("Knowles Dep.") pp. 123-24; Dkt. No. 163-4 ("McIntyre Aff.") ¶ 5.)  While BeLue and

his fellow DEU agents almost never sought judicial authority to dispense with the knock-and-

announce requirement, they almost always ignored the requirement in practice.  Of the 120-150

DEU residential search warrants BeLue helped execute, he could think of "maybe one or two"

when DEU sought or obtained no-knock authority.  (BeLue Dep. p. 236.)  Dean Bishop, who

joined DEU in 2006 and participated in about 500 of its residential search warrant executions,

testified that "less than 1 percent, 2 percent" provided no-knock authority. (Dkt. No. 163-7 ("Bishop Dep.") pp. 157-58.) Nevertheless, in DEU agent Mark McIntyre's experience, "DEU almost always forcibly entered without knocking and announcing, or simultaneously with announcing." (McIntyre Aff. ¶ 11.) Defendant has not objected to the Magistrate Judge's recommended finding that "DEU had a widespread and persistent policy of executing search warrants without knocking and announcing and waiting a reasonable time before entering a private residence." (Dkt. No. 173, p. 39.)

## II.    On April 16, 2015, BeLue and Other DEU Agents Break into Julian Betton's Home Without Knocking and Announcing and Fire 29 Bullets at Him.

### A.    BeLue Participates in DEU's Plan for the Betton Raid.

In early 2015, DEU Agent Chad Guess became the Case Agent for DEU's investigation into plaintiff Julian Betton. (Dkt. No. 163-10 ("Guess Dep.") pp. 71, 112.) Under Guess's supervision, with funds provided by DEU, a confidential informant went to Betton's apartment at 602 Withers Swash Drive and purchased seven grams of marijuana from him on March 24, 2015, and eight grams on April 7, 2015, paying $100 each time. (Dkt. No. 163-21.)

Guess obtained a standard knock-and-announce search warrant for Betton's apartment. (Dkt. No. 163-21.) Consistent with DEU's normal practices, he did not seek or obtain no-knock authority to execute the warrant. (Dkt. No. 163-19.) He also obtained arrest warrants and a criminal history for Betton. (Guess Dep. p. 108; Dkt. No. 163-20.)

On April 16, 2015, Guess assembled nearly a dozen DEU agents and MBPD officers, including BeLue, to participate in the Betton raid and a pre-raid briefing. (Guess Dep. pp. 127-28.) Pursuant to the raid plan, at least four of the agents, including BeLue, would be armed with semi-automatic rifles. (Guess Dep. p. 128.)

Before the pre-raid briefing, BeLue knew nothing about Betton or the upcoming raid. (BeLue Dep. p. 47.)  At the briefing, BeLue reviewed the "Operational Plan," which included information that the informant had seen two firearms inside Betton's apartment and two security cameras at the front door.  (Dkt. No. 163-14, pp. 3, 5; BeLue Dep. pp. 61-62).[1]  BeLue was told that Betton's criminal history – which indicated no criminal charge in the preceding seven years or conviction of any crime involving the use of violence ever, (Dkt. No. 163-20) –  included "a possible narcotics warrant out of, I believe it was Ohio," "[b]ut that it had not been confirmed." (BeLue Dep. p. 50.)  BeLue understood the search warrant required the agents to knock, announce, and wait a reasonable period of time before forcible entry.  (BeLue Dep. pp. 53-55.)

During the briefing, Guess assigned himself to use the battering ram but no one else to any role other than the generic labels of "Entry" and "Perimeter." (McIntyre Aff. ¶ 7; Guess Dep. pp. 111-13; BeLue Dep. pp. 116-17.)  Instead, each DEU officer was expected to figure out his or her role upon arrival at the scene.  (Id.; BeLue Dep. pp. 116-18.)  BeLue was one of the officers assigned to the "Entry" team. (BeLue Dep. p. 74.)  Consistent with DEU's common practice, no one was assigned to knock and announce.  (Guess Dep. p. 113; McIntyre Aff. ¶ 7.) At the Betton briefing, BeLue raised no concern about the lack of no-knock authority in the search warrant or the lack of a knock-and-announce assignment. (BeLue Dep. pp. 54, 79.)

Chuck Drago, plaintiff's police practices expert, explained how this approach to raid planning and execution deviates from accepted police practices and increases the risk of violence.  (Dkt. No. 163-27 ("Drago Report").)  Assignments should not be decided "by random scenarios such as 'whoever arrives first,'" because allowing agents to "pick and choose their

---

[1] Betton obtained the security system and firearms after being assaulted in a violent home robbery in early 2014.  (Dkt. No. 163-6 ("Betton Dep.") pp. 68-69, 83-85.)  He never fired the weapons.  (Betton Dep. p. 215.)

assignment" creates the risk that some assignments may go unmanned, "such as knocking or announcing before entering." (Drago Report ¶¶ 31, 32.)

BeLue and other members of the assigned entry team for the Betton raid were not wearing law enforcement uniforms or any readily visible insignia indicating they were law enforcement officers. (Dkt. No. 163-15 ("Porch Video 1").) They instead wore a mix of face masks, long-sleeved t-shirts, short-sleeved knit shirts, backwards baseball caps, khakis, and blue jeans. (Id.; Dkt. No. 163-13 ("Waddell Dep.") pp. 141, 148, 151.)

Drago observed that the entry team officers "were not wearing uniforms," and instead "dressed in various types of clothing with little to no similarity to each other." (Drago Report ¶ 41.) He stated: "I was a police officer for 35 years and served as a SWAT member, a plain clothes tactical member and as the supervisor of two narcotics units, and I would not have immediately recognized these officers as police officers." (Id. ¶ 52.)

### B. Without Knocking, Announcing, or Waiting, BeLue and Other DEU Agents Break into Betton's Home.

At approximately 2:50 p.m. on April 16, 2015, at least four vehicles filled with DEU agents and non-DEU MBPD officers converged on the two-story, four-unit apartment building at 602 Withers Swash Drive. (Bishop Dep. p. 127.) Betton's apartment was on the lower right side. (Dkt. No. 163-14, p. 2.)

BeLue was the first to arrive, driving a white, unmarked SUV directly onto the front yard. (McIntyre Aff. ¶ 8; Dkt. No. 163-3 ("Garcia Aff.") ¶ 3; BeLue Dep. pp. 123-24, 193; Porch Video 1.) Betton's neighbor Santos Garcia was standing next to his moped by the front porch. (Garcia Aff ¶ 3; Porch Video 1.) As other vehicles arrived, BeLue got out of his SUV, pointed

his semi-automatic rifle at Garcia's face, and ordered him to the ground.  (Id.)  Garcia

immediately complied.  (Id.)  BeLue's forward momentum never stopped.  (Porch Video 1.)

    BeLue continued to lead agents Guess, Jason Brummett, Chris Dennis, and Frank

Waddell up to Betton's front door.  (BeLue Dep. pp. 124-35.)  Guess carried the battering ram,

while the rest had semi-automatic rifles.  (Id.; Porch Video 1.)  BeLue ran onto the porch and

arrived first at the door.  (Id.)  He did not knock.  (Id.)  Instead, he opened the screen door

without hesitation.  (Id.)  While he opened the screen door, Dennis and Brummett flanked the

door with their assault rifles drawn.  (Id.)  After opening the screen door, BeLue did not knock

on the interior door.  (Id.)  He did not try to open the interior door, which was unlocked.  (Id;

BeLue Dep. pp. 92-93; Betton Dep. p. 109.)  Instead, he pulled back the screen door while Guess

ran onto the porch with a battering ram, followed by Waddell, whose assault rifle was drawn.

(BeLue Dep. pp. 124-35; Porch Video 1; Garcia Aff. ¶ 4.)  BeLue held the screen door open,

clearing the way for Guess to break in the front door with the ram.  (Id.)   Neither BeLue nor any

other officer announced their presence before breaking in Betton's door.  (Garcia Aff ¶ 4.)

    From the moment BeLue first stepped out of his SUV until Guess smashed in Betton's

door, only 11 seconds passed.  (Porch Video 1.)  During that period, no one knocked or

announced.  (Id.; Dkt. No. 163-9 ("Gall Dep.") pp. 91-92; Guess Dep. p. 156 ("No knock-and-

announce happened.").)  From the moment BeLue first stepped on the front porch until Guess

smashed in Betton's door, only five seconds elapsed.  (Porch Video 1.)  BeLue has not objected

to the Magistrate Judge's description of the porch videos or her finding that none of the officers

knocked or announced before Betton's front door was rammed.  (Dkt. No. 173, pp. 5-6, 8.)

    The officers' failure to knock, announce, and wait a reasonable period of time before

forcing entry was consistent with DEU's established practices.  (McIntyre Aff. ¶ 11.)  Belue,

Waddell, and Guess confirmed that nothing unusual happened in the Betton raid up to the moment the door was breached.  (BeLue Dep. pp. 91-92, 143-44; Waddell Dep. p. 217; Guess Dep. p. 249.)  DEU Commander Knowles testified that in his view, the officers who executed the Betton raid "didn't do anything wrong."  (Knowles Dep. pp. 51-52.)

### C.    BeLue and Two Other DEU Agents Shoot Betton Immediately After Entering His Home.

Immediately after Guess broke in Betton's front door, Dennis, Waddell, and BeLue entered Betton's living room with their semi-automatic rifles raised in front of their chests. (BeLue Dep. p. 93.)  Betton was leaving his bathroom.  (Betton Dep. p. 115.)  Startled by the break-in, and having been assaulted in a violent home robbery a year earlier, Betton reached for a gun in his back waistband.  (Betton Dep. pp. 115, 119-20.)  He did not raise or point the gun at anyone.  (Betton Dep. pp. 115-16.)

At that point, the DEU agents had not identified themselves as law enforcement officers or issued Betton any commands.  (Betton Dep. p. 116.)  The only thing Betton heard before being shot was the sound of his front door being broken down.  (Betton Dep. p. 112.)  If Betton had known the men were police, he would have voluntarily submitted to their authority and fully complied with any commands.  (Dkt. No. 163-2 ("Betton Decl.") ¶ 3.)

Instead of saying anything, BeLue and the other agents opened fire.  (Betton Dep. p. 121.)  No more than two or three seconds passed from the moment Guess broke down the door until the agents began firing.  (Guess Dep. p. 161; BeLue Dep. p. 98; Garcia Aff. ¶ 5; McIntyre Aff. ¶ 10.)  BeLue said Betton appeared to be hit, dropped his weapon, took a couple steps backwards, and fell into the hallway.  (BeLue Dep. p. 200-01.)

DEU agents fired 29 bullets at Betton.  (Dkt. No. 163-26 ("Cloutier Report") p. 5, fn. 1.)

BeLue fired nine of those shots.  (Id.)  Betton was hit nine times.  (Betton Decl. ¶ 1.)  The crime

scene investigation conducted by the South Carolina Law Enforcement Division ("SLED")

revealed multiple bullet holes close to the floor where Betton fell.  (Dkt. No. 163-30 ("Crime

Scene Notes") pp. 14-15.)

The raid left Betton in a medically induced coma for six weeks.  (Betton Decl. ¶ 4.)  He

was required to undergo multiple surgeries.  (Id.)  To date, he has incurred more than $3,000,000

in medical expenses.  (Id.)  Betton is permanently paralyzed from the waist down, lives with

constant pain, and requires daily attendant care.  (Id.)  Betton is expected to incur $6.8 million to

$13.2 million in future medical expenses due to his injuries.  (Dkt. No. 163-28, p. 3.)

In their search of Betton's apartment on April 16, 2015, agents collected a small quantity

of marijuana.  (Dkt. No. 163-21, p. 6.)  Officers found no other drugs.  (Id.)

### III.    BeLue Makes Multiple False Statements About the Betton Raid.

In the hours following the Betton raid, SLED began to investigate whether the officers

who shot Betton had committed a crime.  (Knowles Dep. p. 166.)  Agents BeLue, Guess, Dennis,

and Waddell, and Deputy Commander Bishop were all permitted to provide written statements to

SLED the day after the shooting.  (BeLue Dep. p. 171.)  All of them said the agents knocked,

announced, and waited at Betton's door before forcing entry.  (Dkt. No. 163-16 p. 1; Dkt. No.

163-18 p. 2; Dkt. 163-22 p. 2; Dkt. No. 163-23 p. 3; Dkt. No. 163-25 p. 1.)  In his statement,

BeLue mentioned no exigent circumstance that would have justified a no-knock entry.  (Dkt. No.

163-18.)  BeLue, Dennis, and Waddell all told SLED that Betton shot at them first, prompting

them to return fire.  (Dkt. No. 163-18 p. 2; Dkt. No. 163-16 p. 1; Dkt. No. 163-23 p. 3.)

A month later, on May 15, 2015, during an interview by MBPD Lieutenant Tommy Chestnut for MBPD's internal investigation, BeLue repeated his statement that the agents knocked, announced, and waited at Betton's door before forcing entry.  (BeLue Dep. pp. 193-99.)  BeLue again did not mention any exigent circumstance justifying the entry.  BeLue also stated that he "distinctly remembered" Betton firing one round at the agents but "couldn't tell" if Betton "fired more or not."  (BeLue Dep. p. 198.)

After BeLue made his statements to SLED and MBPD about the entry, review of video footage from Betton's front porch revealed the officers' statements were false: there was no knock-and-announce or waiting.  (Porch Video 1; Gall Dep. pp. 91-92; Guess Dep. p. 156).  The officers' statements that Betton shot at them were also false: the SLED investigation and firearms analysis revealed that Betton did not fire his gun.  (Cloutier Report pp. 5-6.)  Neither BeLue nor any of the other agents were disciplined by DEU for their conduct during the Betton raid or for their misstatements afterward.  (Knowles Dep. pp. 51-52.)

After the SLED investigation proved that their initial statements about Betton firing his gun were false, BeLue, Dennis, and Waddell continued to claim that Betton pointed and presented his gun at them; and, based on those claims, DEU filed criminal charges against Betton for felonious "pointing or presenting a weapon" at them.  (Guess Dep. pp. 231-32.)  When defendant Jimmy Richardson, the 15th Circuit Solicitor, recused his office from prosecuting all charges against Betton, (Dkt. No. 163-12 ("Richardson Dep.") pp. 130-31, 135), the South Carolina Attorney General's Office took over the prosecution and dismissed all of the pointing and presenting charges.  (Betton. Decl. ¶ 5.)

In his interrogatory responses, consistent with his earlier statements, BeLue mentioned no exigent circumstance that justified disregarding the knock-and-announce requirement.  (Dkt. No.

163-33.)  BeLue reiterated this position in his November 2016 deposition, testifying he encountered no exigent circumstances justifying his or anyone else's no-knock entry into Betton's apartment.  (BeLue Dep. pp. 142-48.)

By affidavit, BeLue now claims he encountered an exigent circumstance when two agents unexpectedly entered Betton's apartment after Guess unexpectedly rammed down the door, and he "believed the other two DEU agents were in danger."  (Dkt. No. 149-2, ¶¶ 8-10.) These recent statements are belied by BeLue's contemporaneous statements to SLED and MBPD investigators about the Betton raid, his failure to articulate any exigent circumstances in those statements, and his previous sworn testimony in this litigation.

## STANDARD OF REVIEW

Summary judgment is appropriate only where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When reviewing the motion, "the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in its favor." *American Legion Post 7 v. City of Durham*, 239 F.3d 601, 605 (4th Cir. 2001).

## ARGUMENT

**I.      BeLue Is Liable for the Failure to Knock, Announce, and Wait a Reasonable Time Before Entering Plaintiff's Home.**

**A.      BeLue Is Liable for His Own Violation of the Knock-and-Announce Requirement and for His Team's Violation of the Knock-and-Announce Requirement.**

On April 16, 2015, BeLue and the other DEU agents failed to knock, announce, and wait a reasonable time before they forcibly entered Betton's home.  BeLue, the first agent to reach Betton's door, is liable for this unconstitutional conduct.

The knock-and-announce requirement "forms a part of the Fourth Amendment reasonableness inquiry." *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995). "[T]he Fourth Amendment require[s] officers to knock and announce their presence, and wait a reasonable period of time, prior to entering a dwelling." *Gould v. Davis*, 165 F.3d 265, 270 (4th Cir. 1998). This obligation "serves the valuable ends of '(1) protecting the safety of occupants of a dwelling and the police by reducing violence; (2) preventing the destruction of property; and (3) protecting the privacy of occupants.'" *Bellotte v. Edwards*, 629 F.3d 415, 419 (4th Cir. 2011) (quoting *Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996)). Betton's evidence shows that the DEU agents unconstitutionally entered his home without having knocked, announced, or waited a reasonable time.

BeLue is liable for the unlawful entry for three reasons. First, he was a direct personal participant in the operation. Second, even if he were not, he set in motion a series of acts that he knew or should have known would cause a constitutional violation. Finally, because he acted pursuant to an agreement to violate Betton's rights, BeLue is liable for the team's violations.

### 1.    BeLue's "Direct Personal Participation" in the Unlawful Entry Establishes his Liability.

BeLue is liable for the unlawful entry because he was directly involved in every aspect of the raid. Officers are liable under § 1983 when they have "'some kind of direct personal participation'" in the constitutional violation. *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998) (quoting *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 560-61 (1st Cir. 1989)); *see also Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) (officers are liable under § 1983 when they take "deliberate, intentional acts that caused or contributed to the violation" (internal quotations omitted)). Officers cannot escape Fourth Amendment liability simply by pointing

fingers at each other; all participants in the violation are liable. *See, e.g.*, *Bellotte*, 629 F.3d at 418 (allowing § 1983 claims to proceed against multiple officers on team who entered a home without knocking, announcing, and waiting a reasonable period of time for a response).

BeLue was undeniably a personal participant in the Betton raid. He participated in the pre-raid briefing; knew no one was assigned to knock and announce; was the first officer to the door; opened the screen door without knocking; chose not to knock on the interior door; and did not try to open the unlocked interior door. Instead, he held the screen door open for Guess to ram the interior door open. BeLue never announced he was a police officer before entering Betton's apartment. Evidence of BeLue's "direct personal participation" in the unlawful entry is overwhelmingly sufficient to hold him liable under Section 1983. *See Sales*, 158 F.3d at 776.

In *Sales*, 158 F.3d at 776, the Fourth Circuit relied on a case holding liable an officer who had far less personal participation in the unconstitutional conduct than BeLue. *See Gutierrez–Rodriguez*, 882 F.2d at 560-61. In *Gutierrez-Rodriguez*, the First Circuit addressed a team of four officers who approached civilians in a car with guns drawn, not identifying themselves as police. *Id.* at 559-61. When the civilians tried to flee, officers opened fire, permanently paralyzing the plaintiff. *Id.* at 557. On appeal, an officer who had not shot the plaintiff, but had merely approached the vehicle with his gun drawn, contended he could not be held liable for the plaintiff's injury. The First Circuit rejected that argument, citing evidence that the officer "exited the vehicle along with the other three officers with his gun drawn and thus was an active participant in the event that caused plaintiff's injuries." *Id.* at 560. "[A]ll four of the officers who participated in the intervention" could therefore be held liable for the plaintiff's injuries. *Id.* at 561. BeLue's direct, personal involvement in the unlawful entry here far exceeds the officer's conduct in *Gutierrez-Rodriguez*.

Other courts have allowed liability based on far less personal participation than BeLue's. *See, e.g.*, *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (holding that officers on the site of a building search while another officer conducted an illegal pat-down could be liable for the pat-down); *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004) (holding all officers participating in a search could be liable even though only one used the complained-of "flash bang device").

The Second Circuit addressed a highly analogous scenario in *Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014). In that case, a team of officers forcibly entered a home after knocking, announcing, and waiting only five seconds. *Id.* at 241-42. The court concluded that seven officers could be personally liable for failing to adequately knock-and-announce, including the officer who knocked, the officer who breached, two officers who entered the home following the breach, and three officers deployed to the back of the house whose actions "frustrated the purpose of knocking and announcing." *Id.* at 243; *see also id.* at 242 n.25 (describing each officer's role in the operation). Because multiple officers were participants in the unconstitutional entry, multiple officers could be held liable for the violation. *Id.*

In his objections, BeLue describes his conduct on the porch as merely opening the screen door and waiting. (Def.'s Objs., Dkt. No. 181, pp. 6-8.) But BeLue fails to acknowledge his constitutionally significant omissions. He did not knock before opening the screen door, though he could have. He did not knock on the interior door, though he could have. Those omissions violate the Fourth Amendment. *See Gould*, 165 F.3d at 270. While BeLue has claimed he announced the officers' presence when opening the screen door, plaintiff's evidence, which must be credited, shows no one announced. (Garcia Aff. ¶ 4; Gall Dep. pp. 91-92). BeLue's own failure to do so violated the Fourth Amendment. *See Gould*, 165 F.3d at 270.

Defendant contends that the Magistrate Judge's report "omits a careful analysis of the facts." (Def.'s Objs., p. 7.) But it is BeLue who has failed to analyze the relevant facts, namely that he personally failed to knock on the screen door, failed to knock on the interior door, and failed to announce. As the Magistrate Judge concluded, BeLue violated the Fourth Amendment because, "[a]t bottom, he failed to knock and he failed to announce." (Dkt. No. 173, p. 25.) BeLue has not and cannot identify any flaw in the Magistrate Judge's reasoning.

BeLue relies on cases that do not support his position. In *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006), officers responded to a late night call about a loud party and arrived at the house in question. *Id.* at 400-01. Entering the yard, they were able to see into the home's kitchen through a screen door and windows. *Id.* at 401. They saw an altercation in the kitchen between four adults and a juvenile, who punched one of the adults, causing him to spit blood in a sink. *Id.* An officer opened the screen door and announced the officers' presence. *Id.* Unnoticed amid the tumult, the officer then entered the kitchen and again called out, which stopped the altercation. *Id.*

The Supreme Court held that the officers were permitted to enter the home without a warrant because they had an objectively reasonable basis for believing that an occupant was seriously injured or imminently threatened with serious injury. *Id.* at 403, 406. The manner of their entry was also reasonable because nobody heard the first announcement of their presence, and it was only after the announcing officer stepped into the kitchen and announced himself again that the fight subsided. *Id.* at 406-07. There was no violation of the knock-and-announce rule because, under the circumstances, the officers' announcement "was at least equivalent to a knock on the screen door," and the officers did not have to wait while the fight in front of them continued unabated. *Id.*

Unlike the officers in *Brigham City*, BeLue and his fellow agents did not announce their presence. And unlike the officers in *Brigham City*, BeLue and his fellow agents were not confronted with an ongoing fight causing serious injuries, or any other exigent circumstance. They were thus not permitted to dispense with the requirements to knock, announce, and wait.

In *People v. Harvey*, 195 N.W.2d 773 (Mich. App. 1972), officers with a search warrant approached the residence and knocked several times on the outer screen door of a semi-closed-in porch on the front of the home. *Id.* at 774. The house lights were on but no one came to the door. *Id.* When there was no response to the knocking, an officer pushed in the screen door and they entered the porch. *Id.* The officers were then confronted by an inner door leading to the living room of the premises. *Id.* The officers knocked on this inner door and loudly announced their presence and purpose. *Id.* After waiting a few seconds with no response, the officers forcibly entered the home. *Id.* The court concluded that there was no constitutional violation because the officers knocked, announced, and waited before entering "the door leading to the living quarters." *Id.* at 775.

Here, in sharp contrast, Betton's screen door and front door were in the same door frame "leading to the leaving quarters." BeLue and his fellow agents did not knock on either, or announce themselves, or wait. BeLue's multiple deviations from those police procedures approved in *Harvey* over 40 years earlier only underscores the flagrancy of his violation of long-established constitutional requirements on April 16, 2015.

In *State v. Steingraber*, 296 N.W.2d 543 (S.D. 1980), another case involving a screen door to a porch and a separate front door to the living quarters, the court held that officers need not knock and announce at the screen door to the porch, as long they knock and announce "at the

front door to the living area." *Id.* at 544-45. Here, however, BeLue and his fellow agents failed to knock and announce "at the front door to the living area" or anywhere else.

BeLue was a direct, personal participant in nearly every aspect of the unlawful entry. And he personally failed to knock, announce, and wait before entering plaintiff's home. He is liable for his own and his team's unconstitutional conduct.

> **2.     Even If BeLue Were Not a Direct Participant in the Violation, He Was Still an Effective Cause of the Violation.**

"Direct participation" is not the only way an officer can be held liable for a constitutional violation. The Fourth Circuit also recognizes that, absent direct participation, an officer is liable if he "sets in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Sales*, 158 F.3d at 776; *see also Newsome v. Watson*, No. 2:14-cv-94, 2014 WL 4202480, at *5 (E.D. Va. 2014) (holding an officer could be liable for another officer's use of excessive force based on the principles of effective causation). Defendant contends that "the actions of other police officers" are irrelevant, (Def.'s Objs., p. 6), but provides no reason why the Fourth Circuit standard in *Sales* does not apply. Under *Sales*, even if BeLue is somehow not deemed a direct participant in the unconstitutional conduct, he was still an effective cause of the violation.

BeLue was the first officer at Betton's front door frame. Rather than knocking on the screen or interior door, he chose to open the screen door for Guess to ram in the interior door. As Guess was running onto the porch with the ram, no one was in a better position than BeLue to knock on Betton's door before Guess rammed it down. By failing to knock, and instead silently opening the screen door for Guess, BeLue "set in motion" Guess's conduct.

16

Moreover, BeLue knew or should have known Guess was not going to knock and announce. DEU had a pervasive practice of disregarding the knock-and-announce requirement. (McIntyre Aff. ¶ 11; BeLue Dep. pp. 91-92, 143-44; Waddell Dep. p. 217; Guess Dep. p. 249; Knowles Dep. pp. 51-52.) DEU's official policies did not contemplate that warrants would be executed in any manner other than a dynamic entry raid and did not require knocking and announcing. (*See* Dkt. No. 163-17, pp. 13-23; Drago Report ¶¶ 1-18.) BeLue had been assigned to DEU for five years and participated in the execution of over 120 residential search warrants. As an active serial participant, BeLue had direct knowledge of DEU's policy and practice of disregarding the knock-and-announce requirement. And he knew that no one in the Betton raid was assigned the task of knocking and announcing. Given DEU's policies, routine failure to knock and announce, and lack of assignments for the Betton raid, when BeLue opened the screen door for Guess, he knew or should have known that Guess would ram in Betton's door, violating the Fourth Amendment. BeLue is liable for the unconstitutional entry even if the Court concludes he was not a direct participant.

### 3.     BeLue Is Liable Because He Acted Together With Other Officers Pursuant to an Agreement to Violate Plaintiff's Rights.

Finally, a jury could hold BeLue liable because of evidence that he acted as part of a conspiracy to violate plaintiff's Fourth Amendment rights.[2] Individuals are liable under Section 1983 when evidence shows they acted "jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right[.]" *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). To survive summary judgment,

---

[2] Having found the evidence showed that BeLue was a direct personal participant and effective cause of the unconstitutional entry, the Magistrate Judge did not address the question of BeLue's involvement in a conspiracy. (Dkt. No. 173, p. 16 n. 6.)

17

"evidence must, at least, reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* A plaintiff "need not produce direct evidence of a meeting of the minds" and may rely on "circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.*

Here, ample circumstantial evidence shows BeLue, the entry team, and their supervisors planned to ignore the knock-and-announce requirement during the Betton raid. BeLue participated in the pre-raid meeting at which all officers knew they had a knock-and-announce warrant, but the only specific assignment was for Guess to use the battering ram; the officers knew DEU had a practice of disregarding the knock-and-announce requirement; and no one raised any question about the knock-and-announce requirement. (Facts Section II.A, *supra*.) The officers' conspiratorial intent is buttressed by evidence suggesting collusion after the operation. Before SLED recovered the porch video footage, each member of the entry team and their superior (Deputy Commander Bishop) gave statements to SLED including nearly identical false representations that the team knocked, announced, and waited a reasonable period of time before forcing entry. (Facts Section III, *supra*.) BeLue, Waddell, and Dennis also gave identically false statements to SLED about Betton firing at them first. (Id.) Their superiors failed to discipline any participant for their role in the raid or for their false statements, (Knowles Dep. pp. 51-52), further confirming the scope of the conspiracy and the fact that BeLue acted according to everyone's plan.

Therefore, even if the Court somehow finds no jury could conclude BeLue was a "direct participant" in the constitutional violation or an "effective cause" of the violation, a jury could

still conclude that BeLue had an agreement with the other officers to violate plaintiff's rights, and then performed overt acts in furtherance of the agreement.  *See Hinkle*, 81 F.3d at 421.

### B.     BeLue Is Not Entitled to Qualified Immunity for the Unlawful Entry.

In his objections, BeLue asserts that he is entitled to qualified immunity.  (Def.'s Objs., pp. 6-10.)  BeLue is plainly mistaken.  Since at least 1992, it has been clearly established that the Fourth Amendment requires "officers to knock and announce their presence, and wait a reasonable period of time, prior to entering a dwelling."  *Gould v. Davis*, 165 F.3d 265, 270 (4th Cir. 1998); *see also Bonner v. Anderson*, 81 F.3d 472, 476 (4th Cir. 1996) (recognizing the knock-and-announce rule "has a long heritage, dating back to the English common and statutory law of 1275" and "satisfies the test of being a clearly established right").  A reasonable officer in 2015 would certainly have known he could not execute a no-knock entry without either exigent circumstances or a no-knock warrant.

Defendant nevertheless contends it was not clearly established that his particular role in the unlawful entry, which he characterizes as merely opening the screen door, violated the Fourth Amendment.  (Def.'s Objs., pp. 6-8.)  There are three independent flaws in this argument.

First, BeLue ignores his other acts leading to the entry.  He chose not to knock on the screen door.  He chose not to knock on the interior door.  He never announced.  All those acts violate clearly established law.  *See Gould*, 165 F.3d at 270.  In fact, it is apparent BeLue and the other agents knew the law required them to knock and announce, because they all submitted false statements to SLED claiming to have knocked, announced, and waited.

Second, BeLue's argument requires resolving factual disputes in his favor.  Plaintiff's evidence shows BeLue knowingly facilitated Guess's unconstitutional entry because DEU had a practice of disregarding the knock-and-announce requirement, no one was assigned to knock and

announce, and BeLue held the screen door open while Guess was running toward the door with a battering ram. *See* Section I.A.2, *supra*. The fluid ease with which BeLue and everyone else executed their roles shows the operation proceeded exactly as everyone intended. (Porch Video 1.) A jury could easily credit this evidence and reject BeLue's assertion that he was oblivious to what Guess was going to do with a battering ram. Summary judgment is thus inappropriate.

Finally, defendant's argument is legally unfounded. Defendant apparently contends he is entitled to qualified immunity because he knows of no other cases involving screen doors where the officer's conduct was found unconstitutional. The "screen door defense" misapprehends the nature of qualified immunity. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Gould*, 165 F.3d at 271 ("In order to find that the law in a given area is clearly established, there need not be a prior case directly on all fours."). "The salient question is whether the state of the law at the time of the events in question gave the officials fair warning that their conduct was unconstitutional." *Id.*

Here, the fact that BeLue held open a screen door hardly excuses his choice not to knock on it, knock on the interior door, or to announce. Nor does it constitute "novel factual circumstances," let alone a circumstance making it unclear whether officers could forcibly enter Betton's home without knocking and announcing. *See Brigham City,* 547 U.S. at 406-07 (holding knock-and-announce requirement applies when officers enter residence through screen door); *Steingraber*, 296 N.W.2d at 545 (only permitting officers to open separate screen door if they knock and announce "at the front door to the living area"); *Harvey*, 195 N.W.2d at 775 (only permitting officers to open separate screen door if they knock and announce at "the door

leading to the living quarters").  BeLue's notion that it takes two people to knock on a door –

contradicted by the life experience of every non-disabled adult – unsurprisingly finds no support

in Fourth Amendment law.  The presence of a screen door in no way renders the state of the law

unclear, and BeLue cites no case suggesting any ambiguity in this arena.  BeLue is thus not

entitled to qualified immunity.

### C.     The Entry Team's Violation of the Knock-and-Announce Requirement Is Not an Exigent Circumstance Justifying the No-Knock Entry.

Defendant does not contend that exigent circumstances excused the entry team's failure

to knock and announce, and has not objected to the Magistrate Judge's conclusion that there

were no exigent circumstances before the agents failed to knock and announce.  (Dkt. No. 173,

pp. 17-18.)  In his deposition, BeLue conceded that no exigent circumstances justified

disregarding the knock-and-announce requirement.  (BeLue Dep. pp. 142-48.)  Instead,

defendant now contends he is entitled to qualified immunity because other officers created an

exigency in the middle of the operation by entering Betton's home without having knocked and

announced.  (Def.'s Objs., pp. 8-10.)  Defendant contends he was justified in entering because of

the "threat of physical violence to his fellow officers."  (Id. at 8.)

This argument ignores BeLue's shared responsibility for the entry team's knock-and-

announce violation.  *See* Sections I.A.1, 2, *supra*.  Contrary to BeLue's repeated misreading of

the Magistrate Judge's report, he is being held liable for his own acts, not the acts of the other

agents.  (Dkt. No. 173, pp. 14-18.)

An officer cannot use the fact that he and others engaged in a constitutional violation to

avoid liability for the violation.  The Supreme Court has unequivocally held that exigent

circumstances do not justify disregarding the Fourth Amendment's requirements when officers

"create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment[.]" *Kentucky v. King*, 563 U.S. 452, 462 (2011); *see also United States v. Saafir*, 754 F.3d 262, 266 (4th Cir. 2014) ("[A]n officer may not manufacture exigent circumstances to justify a warrantless search by means that run afoul of the Fourth Amendment[.]").  The entry team's knock-and-announce violation cannot provide the exigency excusing BeLue's participation in that violation.

One purpose of the knock-and-announce requirement is to protect officer safety by reducing violence. *Bellotte*, 629 F.3d at 419; (Drago Report ¶ 10).  BeLue was first to the door, chose not to knock or announce, and facilitated the forcible entry of Betton's home, increasing the risk to officer safety.  The risk created by an officer's misconduct cannot be used to excuse the misconduct, which is why BeLue has not, and cannot, point to any case supporting such an absurd proposition.  If adopted, this reasoning would eviscerate the knock-and-announce requirement.  Fortunately, the rule forbidding officers from creating exigent circumstances through unconstitutional means forecloses BeLue's argument.  *See King*, 563 U.S. at 462.  This rule, like the knock-and-announce requirement, was clearly established before 2015.

BeLue's officer-created exigency does not excuse his violation of the knock-and-announce requirement or provide him qualified immunity.  Accordingly, his motion for summary judgment regarding plaintiff's Section 1983 unlawful entry claim should be denied.

## II.    The Court Should Deny Summary Judgment on Betton's Claim for Excessive Force.

### A.    BeLue's Decision to Shoot Betton Constituted Excessive Force.

Plaintiff's evidence shows BeLue used excessive force in shooting Betton.  "The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person." *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir. 1997).  To

determine if the amount of force used in effecting an arrest is reasonable, courts consider the severity of the crime at issue; whether the suspect poses an immediate safety threat to officers or others; and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). "The extent of the plaintiff's injury is also a relevant consideration." *Jones*, 325 F.3d at 527. Courts assess the reasonableness of an officer's use of force based on the information available to the officer "'immediately prior to and at the very moment they fired the . . . shots.'" *Hensley v. Price*, 876 F.3d 573, 582 (4th Cir. 2017) (quoting *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991)).

"[T]he mere possession of a firearm by a suspect is not enough to permit the use of deadly force." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013). For example, in *Cooper*, police encountered a man carrying a rifle who never raised or pointed the weapon at the officers. *Id.* Officers opened fire without informing him they were police or issuing any commands to stand down. *Id.* The Fourth Circuit held that a jury could conclude this was an unjustified use of deadly force, reasoning that "an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Id.*

Similarly, in *Hensley*, police responded to reports of a domestic disturbance. 876 F.3d at 578. Upon arrival, they saw the plaintiff struggle with his daughters on his front porch and strike his minor daughter with a handgun. *Id.* The plaintiff then stepped off the porch and began walking directly towards the officers, still carrying the gun. *Id.* The officers "never ordered him to stop, to drop the gun or issued any type of warning." *Id.* They just opened fire. *Id.*

The Fourth Circuit held that the evidence supported plaintiff's claim for excessive force. It noted the plaintiff "never raised the gun to the officers," and also that officers failed to "warn

him—or to order him to drop the gun—before employing deadly force[.]" *Id.* at 584; *see also id.* ("Before an officer may use deadly force, he should give a warning if it is feasible." (*citing Garner*, 471 U.S. at 11-12)). Because the plaintiff "never raised the gun, never threatened the Deputies, and never received a warning command," the officers were not entitled to summary judgment on the plaintiff's excessive force claim. *Id.* at 586.

Here, BeLue claims he used deadly force because he saw Betton pointing a gun at him and his fellow police officers. (BeLue Dep. p. 199.) But this fact is disputed. Betton testified he held his gun but never raised it or pointed it at anyone. (Betton Dep. pp. 115-16.) Betton's account is supported by the Attorney General's Office's decision to dismiss the pointing-and-presenting charges against Betton. He also testified that the officers opened fire without identifying themselves as police, (Betton Dep. p. 116), which is supported by the testimony of a civilian eyewitness. (Garcia Aff. ¶ 3.) BeLue was not wearing a uniform that would have readily identified him as a law enforcement officer. (Drago Report ¶¶ 39-56.) Betton testified the officers did not issue any commands before opening fire. (Betton Dep. p. 116.) BeLue also testified no one issued any command for Betton to drop his gun before the agents opened fire. (BeLue Dep. p. 105.) If the officers had identified themselves or issued commands, Betton would have immediately submitted to their authority. (Betton Decl. ¶ 3.) Because there is a disputed question of fact as to whether Betton raised and pointed his gun at the officers, summary judgement is not warranted. *See Cooper*, 735 F.3d at 159; *Hensley*, 876 F.3d at 586.

The expert testimony cited by BeLue does not support his position. BeLue notes that when expert Chuck Drago was asked whether the decision to "fire at Julian Betton was reasonable," he testified that "<u>based on what the officers testified, based on what they said they believed occurred</u>, I think it was a reasonable response." (Drago Dep. p. 71 (emphasis added)).

This opinion is plainly dependent on crediting the officers' testimony.  But a jury could decline to credit the officers' testimony and instead credit Betton's testimony denying that he raised or pointed his gun at anyone.

BeLue also cites *Salazar-Limon v. City of Houston*, 826 F.3d 272 (5th Cir. 2016) *cert. denied*, 137 S. Ct. 1277 (2017).  In *Salazar-Limon*, the plaintiff had been drinking and was driving a truck on the freeway with three passengers.  *Id.* at 275.  An officer observed the plaintiff speeding and weaving between lanes, so conducted a traffic stop.  *Id.*  After getting the plaintiff's license, the officer asked the plaintiff to exit his vehicle, and the two men walked to the area between the truck and the officer's patrol car.  *Id.*  The officer tried to handcuff the plaintiff, the plaintiff resisted, and a brief struggle ensured.  *Id.*  After the struggle, the plaintiff pulled away from the officer and started to walk away.  *Id.*  The officer pulled out his handgun and ordered the plaintiff to stop.  *Id.*  The plaintiff did not comply with the officer's order.  *Id.*  Instead, the officer saw the plaintiff turn and reach toward his waistband, consistent with reaching for a weapon.  *Id.*  The officer then fired a single shot at the plaintiff.  *Id.*  Based on the totality of the circumstances – including the plaintiff's intoxication, his resisting arrest, his struggle with the officer, his disregard of the officer's order, and his sudden reaching for his waistband – the Fifth Circuit found the officer's use of force was not excessive.  *Id.* at 279.[3]

This is a far different case.  Here, Betton had had no prior interaction with the DEU agents, did not know the agents were police when they entered his home, did not resist arrest, did not fight with the officers, received no warnings, and had not disobeyed any commands.  BeLue and his fellow agents had no objective reason to believe Betton knew they were officers or that

---

[3] Two Justices dissented from the denial of certiorari because they believed there was a disputed question of fact whether the plaintiff turned and reached for his waistband.  *Salazar-Limon*, 137 S. Ct. at 1280-83 (Sotomayor, J., dissenting).

Betton would not have voluntarily complied with their commands.  Betton merely possessed a gun on his own property, like the plaintiffs in *Cooper* and *Hensley*.

This Court recently addressed a highly analogous case, holding that a similar factual dispute about whether the decedent pointed his weapon precluded summary judgment for defendants.  *See Wingate v. Byrd*, 211 F. Supp. 3d 816 (D.S.C. 2016), *vacated in part on other grounds*, 2016 WL 7012962 (D.S.C. Dec. 1, 2016).  In *Wingate*, officers were also investigating a non-violent crime, the operation of an illegal gambling hall.  *Id.* at 825.  After entering the establishment, officers encountered the decedent diving toward a refrigerator.  *Id.* at 827.  The officers testified they only fired after the decedent pointed a gun at them.  *Id.* at 825.  But the plaintiff produced evidence that the decedent did not point a gun.  *Id.* at 828.  Because there was a "genuine issue of material fact as to whether [the decedent] was pointing and presenting a firearm at the time deadly force was used against him[,]" the defendant was not entitled to summary judgment.  *Id.* at 829.

Likewise, in this case, there is conflicting evidence about whether Betton was pointing his gun at the officers.  In light of Betton's testimony and BeLue's record of making demonstrably false statements about what happened outside and inside Betton's apartment, a jury could credit Betton's consistent statements that he was merely holding a gun and had not raised or pointed it.  In addition, plaintiff's evidence shows that officers opened fire without identifying themselves as police and without issuing any warnings or commands.  Because a jury could conclude Betton was shot despite having "never raised the gun, never threatened the [officers], and never received a warning command," BeLue is not entitled to summary judgment.  *Hensley*, 876 F.3d at 586; *see Wingate*, 211 F. Supp. 3d at 829.

**B.    BeLue Is Not Entitled to Qualified Immunity for the Excessive Force.**

The Magistrate Judge concluded, "under *Cooper* and *Hensley*, the right was clearly established that an individual is entitled to be free from the use of excessive force if the person is on his property or in his residence, is in possession of a gun that he is not pointing at police officers, and is not given a warning or command to drop the gun before he is shot." (Dkt. No. 173, p. 27.) Defendant contends this analysis of qualified immunity was incorrect. (Defs. Objs., pp. 4-5) He is mistaken in light of the Fourth Circuit's decisions in *Cooper* and *Hensley*.

In *Cooper*, the Fourth Circuit held that officers were not permitted to shoot an armed man on his own property where they had not informed him they were police, they had not issued any commands or warnings, and he did not raise or point his weapon at them. 735 F.3d at 159-60. The shooting occurred in 2007, and the court held that "the contours of the constitutional right at issue—that is, the right to be free from deadly force when posing no threat—were clearly established at the time the Officers shot Cooper." *Id.* at 160.

Similarly, in *Hensley*, the Fourth Circuit held that officers were not permitted to shoot an armed man on his own property who was walking toward the officers where they had not ordered him to drop the gun, they had not given any warning, and he did not raise or point his weapon at them. 876 F.3d at 586. This shooting occurred in 2012, and the Fourth Circuit held that the officers were not entitled to qualified immunity. *Id.*

Defendant has not given any reason for finding the Magistrate Judge's analysis of *Cooper* and *Hensley* erroneous. In fact, he fails to even mention these controlling cases, apparently hoping the Court will also ignore them. The Magistrate Judge, however, was correct. Under *Cooper* and *Hensley*, BeLue is plainly not entitled to qualified immunity.

Defendant also contends that it is irrelevant whether Betton knew the armed men breaking down his front door were police officers.  (Def.'s Objs. at 6.)  The Fourth Circuit, however, explained the relevance.  In *Cooper*, the court noted that if the officers had identified themselves to the plaintiff, "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat."  735 F.3d at 159.  However, because the officers did not identify themselves, the plaintiff's "perfectly reasonable" rationale for bearing a firearm while investigating a disturbance on his own property "should have been apparent to the Officers at the time of the shooting."  *Id.* at 160.  Likewise, in this case, Betton's "perfectly reasonable" response of holding his firearm because several unidentified, armed men broke down his front door should have been apparent to BeLue at the time of the shooting.

Defendant repeatedly contends that Betton was resisting arrest, (Def.'s Objs., pp. 4, 6), but Betton did not know the DEU agents were police and was merely attempting to defend himself.  Moreover, an objectively reasonable officer would have had no reason to believe Betton was resisting arrest.  Because BeLue and his fellow agents broke into Betton's home without having identified themselves, while wearing non-uniform clothing, and without giving any commands, an objective officer would expect Betton did not know there were police in his home.  Because "[s]elf-defense is a basic right," *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 744 (2010), an objective officer would see Betton holding a gun as a reasonable means of self-defense in one's home, not resistance to a lawful arrest.  *See Cooper*, 735 F.3d at 160; *Doornbos v. City of Chicago*, 868 F.3d 572, 585 (7th Cir. 2017) ("[M]any civilians who would peaceably comply with a police officer's order will understandably be ready to resist or flee when accosted . . . by an unidentified person who is not in a police officer's uniform.").

Just as the plaintiff in *Cooper* posed no threat to the officers and was not resisting arrest, Betton did not pose any threat to BeLue and was not resisting arrest.  Accordingly, BeLue's claim of qualified immunity should be rejected.

### C.     The Amount of Force Used by BeLue Constituted Excessive Force.

A jury could also conclude that the amount of force ultimately used against Betton was unreasonable.  "[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."  *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005).  Officers can be liable for using excessive force when they continue firing their weapons after "the threat to their safety was eliminated."  *Id.*  "It is just common sense that continuing to shoot someone who is already incapacitated is not justified under these circumstances."  *Brockington v. Boykins*, 637 F.3d 503, 508 (4th Cir. 2011).

The number of shots fired is relevant to whether an officer used excessive force.  When officers fire a high number of shots, that fact could lead a reasonable juror to find the officers engaged in gratuitous violence exceeding any reasonable measure of necessary force.  *Id.*  For example, on the facts before it in *Brockington*, the Fourth Circuit contemplated that "thirty-three shots would be unjustified, as would twenty-nine, or even nineteen," and ultimately held that "six is too many."  *Id.* at 508.  It denied qualified immunity, concluding the right had been clearly established by *Waterman*.  *Id.; see also Margeson v. White Cty.*, 579 Fed. App'x 466, 472 (6th Cir. 2014) (unpublished) (holding a jury could "conclude that shooting at a man 43 times" including multiple shots "after he had fallen to the ground" was unreasonably excessive force).

A jury could conclude that officers continued to fire their weapons even after Betton was incapacitated.  BeLue stated that after the officers opened fire, Betton appeared to be hit, dropped his gun, took a couple steps backwards, and fell into the hallway.  (BeLue Dep. p. 200-01.)  The

DEU agents ultimately chose to pull their triggers 29 separate times, firing 29 shots at Betton and hitting him nine times.  (Cloutier Report p. 5, fn. 1; Betton Decl. ¶ 1.)  Bullet holes were found throughout Betton's apartment, including several close to the floor where he fell to the ground. (Dkt. No. 163-30 pp. 14-15; Dkt. No. 163-31; Dkt. No. 163-32.)

A jury could draw the unremarkable inference that Betton was incapacitated and did not remain standing or able to present any threat throughout the entire hail of 29 bullets.  It could easily find that the officers' fusillade continued after Betton dropped his gun and fell to the ground.  A jury could therefore conclude the officers continued shooting Betton even after he was incapacitated, and it was unreasonable to use further deadly force.  *See Brockington*, 637 F.3d at 507-08 (holding that although the initial use of deadly force was reasonable, there was no indication that continued use of force was necessary after the plaintiff had been shot, was on the ground, and wounded).  BeLue could therefore be liable for using excessive force even if his decision to pull the trigger the first or the second time, or even the third or fourth time, was justified.  Accordingly, defendant's motion for summary judgment should be denied with regard to plaintiff's excessive force claim.

### III.    Plaintiff's Assault, Battery, and Trespass Claims Are Not Barred by the South Carolina Tort Claims Act Because Defendant Intended to Harm Plaintiff.

Plaintiff's assault, battery, and trespass claims against defendant are not barred by the South Carolina Tort Claims Act ("SCTCA") because defendant acted with the intent to harm plaintiff.  The SCTCA is "the exclusive civil remedy available for any tort committed by a governmental entity, its employees, or its agents except as provided in Section 15-78-70(b)." S.C. Code § 15-78-20(b) (emphasis added).  Section 15-78-70(b) provides, "Nothing in this chapter may be construed to give an employee of a governmental entity immunity from suit and

liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." *Id.* § 15-78-70(b).

"[I]f the plaintiff proves that 'the employee's conduct . . . constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude,' then the governmental agency is not liable, and the employee is personally liable." *Roberts v. City of Forest Acres*, 902 F. Supp. 662, 671 (D.S.C. 1995) (quoting S.C. Code § 15-78-70(b)). "[T]he SCTCA is not intended to protect state employees from liability for intentional torts." *Anthony v. Ward*, 336 Fed. App'x 311, 317 (4th Cir. 2009) (unpublished).

Under South Carolina law, "an assault occurs when a person has been placed in reasonable fear of bodily harm by the conduct of the defendant, and a battery is the actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree." *Jones by Robinson v. Winn-Dixie Greenville, Inc.*, 318 S.C. 171, 175, 456 S.E.2d 429, 432 (S.C. Ct. App. 1995). "[I]f the officer uses excessive force, or force greater than is reasonably necessary under the circumstances, the officer may be liable for assault or battery." *McCoy v. City of Columbia*, 929 F.Supp.2d 541, 567 (D.S.C. 2013).

BeLue committed assault and battery against Betton by using excessive force. *See* Section II, *supra*. BeLue plainly intended to harm Betton when shooting him, so the SCTCA provides no immunity for BeLue's conduct. *See Wingate v. Byrd*, No. 13-cv-3343-BHH-KDW, 2016 WL 8672954, at *18 (D.S.C. Aug. 19, 2016) (denying summary judgment on state law claim against individual officer because summary judgment on excessive force § 1983 claim was denied), *report and recommendation adopted as modified*, 211 F. Supp. 3d 816 (D.S.C. 2016).

"'Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property.'" *Coll. of Charleston Found. v. Ham*, 585 F. Supp. 2d 737, 750 (D.S.C. 2008) (quoting *Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 357, 559 S.E.2d 327, 337 (S.C. Ct. App. 2001). "The essence of trespass is the unauthorized entry onto the land of another." *Ravan v. Greenville Cty.*, 315 S.C. 447, 464, 434 S.E.2d 296, 306 (S.C. Ct. App. 1993). BeLue's entry into Betton's home was unauthorized because it was unlawful under the Fourth Amendment. *See* Section I, *supra*. Therefore, BeLue's entry constitutes trespass. *See Bailey v. Kennedy*, 349 F.3d 731, 743 (4th Cir. 2003) (holding the officers' unconstitutional entry into a residence constituted trespass). Because BeLue plainly intended to harm plaintiff's property rights when he intentionally entered plaintiff's home without legal justification, the SCTCA provides no immunity for his conduct.

Accordingly, defendant's motion for summary judgment should be denied with regard to plaintiff's claims for assault, battery, and trespass.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that Defendant BeLue's Motion for Summary Judgment be denied.

This 12th day of July, 2018.

PATTERSON HARKAVY LLP

/s/Burton Craige
Burton Craige, NC Bar No. 9180
bcraige@pathlaw.com
Bradley J. Bannon, NC Bar No. 24106
bbannon@pathlaw.com
Narendra K. Ghosh, NC Bar No. 37649
nghosh@pathlaw.com
Paul E. Smith, NC Bar No. 45014
psmith@pathlaw.com

(all admitted pro hac vice)
100 Europa Dr., Suite 420
Chapel Hill, North Carolina 27517
(919) 942-5200


LAW OFFICE OF JONNY MCCOY

 /s/ Jonny McCoy_____
Jonny McCoy, SC Bar No. 77540
District Court Identification Number: 12059
jonnymccoy@gmail.com
1240 21st Ave. North, Suite 105
Myrtle Beach, South Carolina 29577
(843) 848-7325

*Counsel for Plaintiff Julian Ray Betton*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of the filing to James R. Battle, II and Michael Battle, attorneys for defendants.

Dated: July 12, 2018.

/s/ Jonny McCoy_____
Jonny McCoy, SC Bar No. 77540
District Court Identification Number: 12059
jonnymccoy@gmail.com
LAW OFFICE OF JONNY MCCOY
1240 21st Ave. North, Suite 105
Myrtle Beach, South Carolina 29577
(843) 848-7325